Susan Foley-Ciccantelli and
Dr. Mark J. Ciccantelli, Plaintiffs-Appellants,

v.

Bishop's Grove Condominium Association, Inc. and
State Farm Fire & Casualty Company,
Defendants-Respondents.

Supreme Court

*No. 2009AP688. Oral argument October 6, 2010.
—Decided May 24, 2011.*

2011 WI 36

(Also reported in 797 N.W.2d 789.)

407

For the plaintiffs-appellants there was a brief and oral argument by *Timothy J. Andringa, Cramer, Multhauf & Hammes, LLP,* Waukesha.

For the defendant-respondents there was a brief and oral argument by *Neal C. Schellinger, Schellinger & Associates,* Waukesha.

An amicus curiae brief was filed by *John F. Ebbott,* Milwaukee for Legal Action of Wisconsin, Inc., and oral argument by *John F. Ebbott.*

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is an appeal from an order of the Circuit Court for Waukesha

County, Kathryn W. Foster, Judge, on certification by the court of appeals pursuant to Wis. Stat. § 809.61 (2007–08).[1]

¶ 2. The circuit court granted the motion of Bishop's Grove Condominium Association, Inc., the defendant, to disqualify the attorney representing Susan Foley-Ciccantelli and Dr. Mark J. Ciccantelli, the plaintiffs, in their personal injury slip-and-fall action against the defendant.[2] The motion made no allegation of unethical conduct. The circuit court concluded that the plaintiffs' law firm did not engage in any unethical conduct of any kind. The instant case is not a determination of unethical conduct. Violations of the Code of Professional Conduct are determined only by means of disciplinary action. This is a disqualification proceeding, not a disciplinary proceeding.

¶ 3. The circuit court determined, however, that the attorney's law firm had previously represented Bishop's Grove's exclusive property manager, the Foster Group, Ltd., and Wayne Foster, the principal in the Foster Group; that the attorney had communicated with Wayne Foster in regard to the present case; and that the attorney's representation of the plaintiffs in the present case created an appearance of impropriety.

¶ 4. The court of appeals certified two questions. The first addresses whether Bishop's Grove has standing to bring a motion to disqualify plaintiffs' attorney:

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[2] Susan Foley-Ciccantelli alleges she slipped and fell and was injured. Her husband is also a plaintiff; he seeks recovery for his personal injury resulting from his wife's injury. The opinion will refer to both as "the plaintiffs."

(1) Does a non-client party (Bishop's Grove) have standing in a civil action to move for the disqualification of the opposing party's attorney[3] based on that attorney's prior representation of a non-party (The Foster Group and Wayne Foster)?[4]

¶ 5. There is no single longstanding or uniform test to determine standing in the case law. Courts have inconsistently used a variety of terminologies as tests for standing. Therefore, as a prerequisite to answering the first question, we review the law of standing. Upon careful analysis of the case law, it is clear that the essence of the determination of standing is: (1) whether the party whose standing is challenged has a personal interest in the controversy (sometimes referred to in the case law as a "personal stake" in the controversy); (2) whether the interest of the party whose standing is challenged will be injured, that is, adversely affected; and (3) whether judicial policy calls for protecting the interest of the party whose standing has been challenged.

¶ 6. These three aspects of standing do not necessarily eliminate the various tests that have been applied in administrative review cases, in constitutional law cases, and in declaratory judgment cases. These various tests, while at times inconsistently used by courts, when appropriately used in particular types of cases are tools for determining personal interest, adverse effect, and

---

[3] The attorney's firm had represented the Foster Group and Wayne Foster. Supreme Court Rule 20:1.10 imputes disqualification to all members of a law firm.

[4] The court of appeals stated the issue as follows: "Can a circuit court disqualify retained counsel-of-record in a civil suit, thereby denying the client the right to representation by chosen counsel and restricting the attorney's right to practice law in a civil action, where the attorney previously represented a non-party witness for the opposing side?"

judicial policy, the three essential aspects of standing. When a statute, rule, or constitutional provision is at issue, a court determines these three aspects of standing by examining the facts to determine whether an injured interest exists that falls within the ambit of the statute, rule, or constitutional provision involved that judicial policy calls for protecting. When no statute, rule, or constitutional provision directly governs the standing analysis, a court determines these three aspects of standing by examining the facts to determine whether an injured interest exists that falls within the ambit of relevant legal principles that judicial policy calls for protecting. The present case falls within the latter group of cases.

¶ 7. We address the first question relating to standing in light of our analysis of the standing cases. We conclude that as a general rule only a former or current client has standing to move to disqualify an attorney from representing someone else in a civil action. Nevertheless, a non-client party may establish standing, that is, may establish that a personal interest in the controversy is adversely affected and that judicial policy calls for protection of that interest, when the prior representation is so connected with the current litigation that the prior representation is likely to affect the just and lawful determination of the non-client party's position.

¶ 8. We conclude that Bishop's Grove, the non-client defendant, has standing to move to disqualify opposing counsel. Bishop's Grove has shown that the plaintiffs' attorney's prior representation of the Foster Group and Wayne Foster is so connected with the current litigation that the prior representation is likely to

411

affect the just and lawful determination of Bishop's Grove's position.[5]

¶ 9. Because we conclude Bishop's Grove has standing to bring a motion for disqualification in the present case, we next address the second question presented:

(2) Did the circuit court err as a matter of law in applying an "appearance of impropriety" standard in deciding the motion for disqualification? If so, what is the correct standard?

¶ 10. In answer to this question, we conclude that the circuit court applied an incorrect standard of law in disqualifying the plaintiffs' attorney, namely, disqualifying the plaintiffs' attorney on the basis of an "appearance of impropriety."

¶ 11. The appropriate standard a circuit court applies to determine a motion for disqualification of counsel based on an attorney's duty to a former client is guided by SCR 20:1.9. A circuit court must determine: (1) whether there was an attorney/client relationship between counsel and the former client and whether it is over; (2) whether the subsequent representation involves the same or a substantially related matter as the former representation; (3) whether the interests of the subsequent client are materially adverse to those of the former client; and (4) whether the former client consented to the new representation.

---

[5] In other words, Bishop's Grove has standing to advance the Foster Group's and Wayne Foster's rights as former clients of the plaintiffs' counsel. Justice Roggensack's concurrence, on the other hand, would limit Bishop's Grove's standing to assertions that the plaintiffs' attorney has obtained information through a breach of the duty of confidentiality owed to Bishop's Grove. *See* Justice Roggensack's concurrence, ¶¶ 138, 180–183.

¶ 12. In the present case, it is necessary to determine whether the current and former representations involve a substantially related matter and whether the interests of the plaintiffs are materially adverse to those of the former clients, the Foster Group and Wayne Foster.

¶ 13. Given the paucity of facts in the affidavits in the record relating to the attorney's prior representation of the Foster Group and Wayne Foster, we are unable to determine whether the two representations involve substantially related matters and whether the interests of the plaintiffs are materially adverse to the former clients' interests.

¶ 14. Therefore, we cannot determine from the record before us whether the circuit court's order disqualifying the plaintiffs' attorney is erroneous when applying the correct standard. Accordingly, we reverse the order of the circuit court disqualifying the plaintiffs' attorney and remand the matter to the circuit court for such further proceedings as the circuit court determines are appropriate to resolve the question presented.

I

¶ 15. The factual background presented in this appeal can be simply stated.

¶ 16. The plaintiffs purchased a condominium from Bishop's Grove on or about February 1, 2007. Thereafter, the plaintiffs, by their attorney, Timothy J. Andringa of Cramer, Multhauf & Hammes, LLP, brought a personal injury action against Bishop's Grove and Bishop's Grove's insurer, State Farm Fire & Casualty Co., stemming from the plaintiffs' "slip-and-fall" injury on February 6, 2007, at Bishop's Grove's condo-

minium complex. The allegation in the complaint is that the slip and fall occurred on common property owned by Bishop's Grove at an accumulation of ice resulting from negligently maintained rain gutters.

¶ 17.　The Foster Group is "the exclusive managing agent" under a management agreement between Bishop's Grove and the Foster Group (a copy of which is in the record). Under the management agreement, the Foster Group is to, inter alia, "cause the buildings, appurtenances, and grounds of the condominium to be maintained according to the standards acceptable to the association."

¶ 18.　According to the plaintiffs, Bishop's Grove's liability in the slip-and-fall case might arise from the acts or omissions of the Foster Group in maintaining the common property at Bishop's Grove.

¶ 19.　Neither Wayne Foster nor the Foster Group is a party in the slip-and-fall action. However, the plaintiffs and Bishop's Grove view Wayne Foster as a likely witness in the slip-and-fall case. The Foster Group, as real estate property manager, is an insured under State Farm's comprehensive business liability policy issued to Bishop's Grove. The same defense counsel in this slip-and-fall case represents Bishop's Grove and the insurance company.[6]

¶ 20.　Bishop's Grove's counsel filed a motion for disqualification of plaintiffs' attorney upon learning that the Foster Group and Wayne Foster had been

---

[6] The parties disagree as to whether Wayne Foster and the Foster Group are represented by defense counsel. The plaintiffs assert that Wayne Foster and Foster Group are not parties to the action and so defense counsel does not represent them in this action. Defense counsel asserts that, because they are insureds under the policy, he represents Wayne Foster and the Foster Group in this action.

represented by the plaintiffs' attorney's law firm (the Cramer firm) in the past. The plaintiffs and Bishop's Grove submitted affidavits and briefs in support of their respective positions on the motion for disqualification.

¶ 21. Wayne Foster's affidavit describes the relationship between the Cramer firm and the Foster Group and himself as follows:

> 3) Peter Plaushines [an attorney with the Cramer firm] has represented the Foster Group Ltd. for over fifteen years.
>
> 4) Peter Plaushines has represented me as the principal of Foster Group, Ltd. for a variety of business matters.
>
> 5) Most of Peter Plaushines['] representation of Foster Group, Ltd. has involved real estate or real estate development.
>
> 6) Peter Plaushines was counsel for Foster Group, Ltd. development of the Ruff's Preserve subdivision and the Water's Edge Condominium on Lake Nagawicka development, among others.
>
> 7) Peter Plaushines defended Foster Group in the law suit of *Gulseth vs. Cousel,* 2004 CV-1286, Washington County, which ended in about the year 2006 and also involved another land development called Island View.
>
> 8) Peter Plaushines has, as Fosters [sic] Group's attorney, drafted condominium documents and provided advice and counsel regarding all aspects of condominium development in prior years. . . .

¶ 22. Nothing in the record demonstrates that either Wayne Foster or the Foster Group has consented to the Cramer firm's representation of the plaintiffs. Nowhere in the record does Wayne Foster explicitly

object to the Cramer firm's representation of the plaintiffs. Wayne Foster's affidavit is, however, attached to Bishop's Grove's motion to disqualify the plaintiffs' counsel.

¶ 23. The affidavit of Attorney Peter Plaushines of the Cramer firm states that to the best of his knowledge he did not receive confidential information from Wayne Foster regarding the subject matter of the current slip-and-fall representation; that he did not represent Wayne Foster or the Foster Group in any matters involving Bishop's Grove, Inc.; and that he did not receive any confidential information from Wayne Foster or the Foster Group relating to Bishop's Grove.

¶ 24. Attorney Timothy G. Andringa of the Cramer firm filed an affidavit averring that prior to representing the plaintiffs, the firm ran a conflict of interest check against Bishop's Grove; that the firm has never represented Bishop's Grove; and that the firm did not represent Bishop's Grove or the Foster Group with respect to any management agreement involving Bishop's Grove. According to the affidavit, the slip-and-fall action involves neither real estate development nor contractual issues of property management, and the Cramer firm's prior representation of the Foster Group has "no relationship of any kind to the current personal injury case."[7]

¶ 25. At the hearing on the disqualification motion, Bishop's Grove argued that the Cramer firm had a long-term relationship and familiarity with the Foster

---

[7] The record is composed of documents such as the Condominium Association documents, the insurance policy, and affidavits.

The Bishop's Grove condominium association documents were drafted by the Reinhart Boerner Van Deuren S.C. law firm.

Group, which gave the plaintiffs' counsel an unfair advantage in the present case.

¶ 26. Following arguments on the disqualification motion, the circuit court did not make any findings of fact. The circuit court ordered the plaintiffs' attorney disqualified, balancing the plaintiffs' right to retain counsel of their choosing with the "appearance of impropriety" caused by the Cramer firm's prior representation of the Foster Group and Wayne Foster, all in light of plaintiffs' attorney's two communications with Wayne Foster in connection with the current litigation, which we discuss later.

¶ 27. No evidentiary hearing was held to determine whether the Cramer firm's previous representations of the Foster Group or Wayne Foster were substantially related to the subject matter of the slip-and-fall action or whether the plaintiffs' interests were materially adverse to those of the former clients.

## II

¶ 28. We turn first to the question whether Bishop's Grove, a party in the case but not a former client of the plaintiffs' counsel, has standing in a civil action to move for the disqualification of the plaintiffs' counsel, based on the plaintiffs' counsel's prior representation of non-parties.

¶ 29. The question whether Bishop's Grove has standing to move for the disqualification is a question of law that this court determines independently of the circuit court but benefiting from its analysis.[8]

---

[8] *Schill v. Wis. Rapids Sch. Dist.,* 2010 WI 86, ¶ 38, 327 Wis. 2d 572, 786 N.W.2d 177; *State v. Popenhagen,* 2008 WI 55, ¶ 23, 309 Wis. 2d 601, 749 N.W.2d 611.

A

¶ 30. The parties' briefs on the standing issue are relatively cursory. Bishop's Grove relies predominantly on case law establishing that Wisconsin courts liberally construe standing.[9]

¶ 31. The plaintiffs essentially rely on two cases (with facts different from the present case) relating to a lawyer's conflict of interest to persuade the court that Bishop's Grove has no standing under the facts of the present case. The two cases are *Forecki v. Kohlberg,* 237 Wis. 67, 295 N.W. 7 (1940), and *In Matter of Disciplinary Proceedings Against Marine,* 82 Wis. 2d 602, 264 N.W.2d 285 (1978).

¶ 32. *Forecki,* upon which the plaintiffs and Justice Roggensack's concurrence rely, is an appeal of a jury verdict. The defendants in *Forecki* objected to opposing counsel's potential breach of duty to an adversarial party. The defendants alleged that the plaintiffs were adverse to each other and therefore that the circuit court erred in permitting the plaintiffs' counsel to represent both plaintiffs.

¶ 33. The *Forecki* court concluded that the defendants had no right to attack the verdict on these grounds.[10]

¶ 34. The *Forecki* court quoted 7 C.J.S., Attorney and Client, 827, § 47 for the proposition that "[o]nly a party who sustains a relation of client to an attorney . . . may be entitled to object to [a current] representa-

---

[9] Bishop's Grove cites *Wisconsin's Environmental Decade, Inc. v. Public Service Commission of Wisconsin,* 69 Wis. 2d 1, 13, 230 N.W.2d 243 (1975), and *Ramme v. Madison,* 37 Wis. 2d 102, 116, 154 N.W.2d 296 (1967).

[10] *Forecki v. Kohlberg,* 237 Wis. 67, 75–76, 295 N.W. 7 (1940).

tion."[11] The court also ruled that the plaintiffs were "both intelligent and experienced business men" who made no objections to their representation.[12] Further, upon review of the record, and relying on Canon 6 of the Professional Ethics of the American Bar Association, the court determined that "there was in fact no conflict of interests upon which defendants' objections on that ground could have been sustained."[13]

¶ 35. In the second case upon which the plaintiffs rely, the *Marine* disciplinary action, the court cited *Forecki* for the principle that "only the client, and not third persons, has standing to complain of an attorney's representation while adversely interested."[14] Otherwise, the *Marine* case offers no insight into the present case.

¶ 36. These two cases do not answer the standing question posed in the present case. They do not present the fact situation of the instant case. We conclude that the question of standing of a non-client party in a civil action to move for the disqualification of the opposing party's attorney is one of first impression in Wisconsin.

B

¶ 37. We have undertaken a more exhaustive review of the law of standing than presented by the parties. Three teachings emerge from the standing cases:

[11] *Id.* at 75.

[12] *Id.*

[13] *Id.* at 76.

[14] *In Matter of Disciplinary Proceedings Against Marine,* 82 Wis. 2d 602, 605, 264 N.W.2d 285 (1978) (quoting *Forecki*).

419

¶ 38. *One:* Standing in Wisconsin is not to be construed narrowly or restrictively, but rather should be construed liberally.[15]

¶ 39. *Two:* Cases have used a variety of tests to determine whether the party challenged has standing. No single longstanding or uniform test for standing appears in the case law. The terminology used in standing cases often turns on the nature of the case, but even in the same category of cases, the terminology for the test for standing or the application of the test is not consistent. In stating the test for standing, the cases have not paid close attention to the factual or legal distinctions among the cases. Two recent court of appeals cases have acknowledged the lack of uniformity in the case law on standing.[16] The court of appeals has explained:

> The formulation for analyzing the issue of standing has varied somewhat in the case law, in part depending on the nature of the claim asserted. The parties each use a somewhat different formulation in their arguments.

[15] *See, e.g., Schill,* 327 Wis. 2d 572, ¶ 38; *McConkey v. Van Hollen,* 2010 WI 57, ¶ 15, 326 Wis. 2d 1, 783 N.W.2d 855; *Krier v. Vilione,* 2009 WI 45, ¶ 20, 317 Wis. 2d 288, 766 N.W.2d 517; *State v. Popenhagen,* 2008 WI 55, ¶ 24, 309 Wis. 2d 601, 749 N.W.2d 611; *Milwaukee Dist. Council 48 v. Milwaukee County,* 2001 WI 65, ¶ 38, n.7, 244 Wis. 2d 333, 627 N.W.2d 866; *Fox v. DHSS,* 112 Wis. 2d 514, 524, 334 N.W.2d 532 (1983); *Bence v. City of Milwaukee,* 107 Wis. 2d 469, 478, 320 N.W.2d 199 (1982); *Wisconsin's Envtl. Decade, Inc. v. Pub. Serv. Comm'n of Wis.,* 69 Wis. 2d 1, 13, 230 N.W.2d 243 (1975).

[16] *Metro. Builders Ass'n of Greater Milwaukee v. Vill. of Germantown,* 2005 WI App 103, 282 Wis. 2d 458, 698 N.W.2d 301; *Chenequa Land Conservancy, Inc. v. Vill. of Hartland,* 2004 WI App 144, 275 Wis. 2d 533, 685 N.W.2d 573.

*Chenequa Land Conservancy, Inc. v. Vill. of Hartland,*
2004 WI App 144, ¶ 13, 275 Wis. 2d 533, 685 N.W.2d 573.
■

¶ 40. *Three:* On careful analysis of the cases, it is clear that the basic thrust of all the cases, the essence of the determination of standing, regardless of the nature of the case and the particular terminology used in the test for standing, is that standing depends on (1) whether the party whose standing is challenged has a personal interest in the controversy (sometimes referred to in the case law as a "personal stake" in the controversy); (2) whether the interest of the party whose standing is challenged will be injured, that is, adversely affected;[17] and (3) whether judicial policy

---

[17] *Schill,* 327 Wis. 2d 572, ¶ 38 (injunction action; "[a] person has standing to seek judicial review when that person has a personal stake in the outcome and is directly affected by the issues in controversy"); *Popenhagen,* 309 Wis. 2d 601, ¶ 24 (action to suppress bank documents; "[a] person has standing to seek judicial intervention when that person has 'a personal stake in the outcome' and is 'directly affected by the issues in controversy' "); *Zellner v. Cedarburg Sch. Dist.,* 2007 WI 53, ¶ 21, 300 Wis. 2d 290, 731 N.W.2d 240 (public employee challenging release of records has standing because he will be impacted personally and his interests will be adversely affected); *City of Waukesha v. Salbashian,* 128 Wis. 2d 334, 349–50, 382 N.W.2d 52 (1986) (quo warranto action under Wis. Stat. § 784.02 (1985); "[i]n determining whether the municipalities are proper private plaintiffs for a *quo warranto* action, a court's analysis must be couched in terms of injury and interest, not semantics;" relator must show danger of sustaining injury and a "special interest"); *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 228, 332 N.W.2d 782 (1983) (declaratory judgment; "[i]n order to have standing to sue, a party must have a personal stake in the outcome of the controversy"); *Mut. Serv. Cas. Ins. Co. v. Koenigs,* 110 Wis. 2d 522, 526–28, 329 N.W.2d 157 (1983) (parents of injured child challenge dismissal of

calls for protecting the interest of the party whose standing is challenged.[18]

action against their insurer even though they asserted no claim to appeal against insurer; parents are aggrieved parties with standing; dismissal adversely affected their financial interest in having insurance coverage); *Kiser v. Jungbacker,* 2008 WI App 88, ¶ 12, 312 Wis. 2d 621, 754 N.W.2d 180 (appeal of award of attorney's fees; "[t]he essence of the standing inquiry is whether the party seeking review has alleged a personal stake in the outcome of the controversy"); *Shovers v. Shovers,* 2006 WI App 108, ¶ 28, 292 Wis. 2d 531, 718 N.W.2d 130 (declaratory judgment; "[s]tanding requires a personal stake in the outcome of a controversy"); *Lake Country Racquet & Athletic Club v. Vill. of Hartland,* 2002 WI App 301, ¶ 15, 259 Wis. 2d 107, 655 N.W.2d 189 (declaratory judgment; "a party must have a personal stake in the outcome and must be directly affected by the issues in controversy"); *Vill. of Slinger v. City of Hartford,* 2002 WI App 187, ¶ 9, 256 Wis. 2d 859, 650 N.W.2d 81 (declaratory judgment; "a party must have a personal stake in the outcome and must be directly affected by the issues in controversy"); *Sandroni v. Waukesha County Bd. of Supervisors,* 173 Wis. 2d 183, 186, 496 N.W.2d 164 (Ct. App. 1992) (challenge to allegedly illegal county contract; "[i]t is axiomatic that to have standing to sue, a party must have a personal stake in the outcome of the controversy").

An injury to even a "trifling interest" may suffice. *McConkey,* 326 Wis. 2d 1, ¶ 15; *Milwaukee Brewers Baseball Club v. DHSS,* 130 Wis. 2d 56, 65, 387 N.W. 245 (1986); *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 230, 332 N.W.2d 782 (1983); *Fox,* 112 Wis. 2d at 524.

The injury need not be physical, economic, or pecuniary; it may, for example, be aesthetic, conservational, or recreational. *Fox,* 112 Wis. 2d at 525; *Chenequa,* 275 Wis. 2d 533, ¶ 17.

[18] Wisconsin courts evaluate standing as a matter of judicial policy rather than as a jurisdictional prerequisite. *Schill,* 327 Wis. 2d 572, ¶ 38 (injunction action); *Milwaukee Dist. Council 48,* 244 Wis. 2d 333, ¶ 38 n.7 (declaratory judgment action); *First Nat'l Bank of Wis. Rapids v. M&I Peoples Bank of Coloma,* 95 Wis. 2d 303, 308 n.5, 290 N.W.2d 321 (1980) ("[T]he doctrine of standing to sue in federal courts is generally regarded as

¶ 41. These three aspects of standing were aptly summarized in *Wisconsin's Environmental Decade, Inc. v. Public Service Commission*, 69 Wis. 2d 1, 13, 230 N.W.2d 243 (1974), an administrative review case, as follows:

> The only problems about standing should be what interests deserve protection against injury, and what should be enough to constitute an injury. Whether interests deserve legal protection depends upon whether they are sufficiently significant and whether good policy calls for protecting them or for denying them protection.[19]

## C

¶ 42. The terminology used to analyze these three aspects of standing, the personal interest, the adverse effect, and judicial policy, has often depended on the nature of the case, although the decisions do not always make this point clearly. Indeed, the decisions often select the terminology used in the test for standing

constitutionally mandated by the 'cases and controversies' limitation of Article III. U.S. Const., art. III, sec. 2, cl. 1. In Wisconsin, the circuit courts have been granted jurisdiction 'in all *matters* civil and criminal.' Wis. Const., art. VII, sec. 8 (emphasis added). While no case can be found holding standing to be a jurisdictional prerequisite, the doctrine has generally been applied as a matter of 'sound judicial policy.' " (internal citations omitted); *Wisconsin's Envtl. Decade*, 69 Wis. 2d at 13 (administrative agency review); *Metro. Builders Ass'n*, 282 Wis. 2d 458, ¶ 15 (administrative review; "public policy and the mandate to construe standing rules liberally [are] independent reasons supporting standing"); *Zehetner v. Chrysler Fin. Co. LLC*, 2004 WI App 80, ¶ 12, 272 Wis. 2d 628, 679 N.W.2d 919 (violation of statute claimed).

[19] Quoting Kenneth Culp Davis, *Administrative Law Treatise* § 22.00–4, at 722 (1970 Supp.).

without carefully analyzing the nature of the case from which the terminology is derived. Justice Roggensack's concurrence offers a good illustration of this point. It pulls out the "legally protectable interest" language from *Fox v. Wis. Department of Health and Social Services*, 112 Wis. 2d 514, 524, 334 N.W.2d 532 (1983), but fails to acknowledge that the court in *Fox* established this language explicitly for administrative law review cases.[20]

¶ 43. In cases that involve an administrative rule or decision, as well as cases that raise a constitutional challenge to executive or legislative action or cases initiated as declaratory judgment actions, the decisions most often examine and interpret a particular statute or constitutional provision at issue in the case to determine whether the party has standing. Thus, these cases often refer to "legally protectable interests." This phrase or a similar phrase means interests protected by a statute or constitutional provision at issue.

¶ 44. For example, in cases involving review of a rule or decision of an administrative agency, courts have interpreted standing in light of the substantive statutes and regulations at issue and the text of chapter 227. Chapter 227 governs administrative procedure and review and speaks in terms of review by "persons aggrieved" and persons "directly affected."

¶ 45. In *Fox* the personal interest, the adverse effect, and the judicial policy aspects of standing were set forth as follows:

> This court has established a two-part analysis, similar to the federal test, *for determining whether parties seeking to challenge an administrative rule have standing.* The first step is to determine "whether the decision

---

[20] *Fox,* 112 Wis. 2d at 524 ("This court has established a two-part analysis . . . for determining whether parties seeking to challenge an administrative rule have standing.").

of the agency directly causes injury to the interest of the petitioner. *The second step is to determine whether the interest asserted is recognized by law"* (citations omitted; emphasis added).

*Fox v. DHSS,* 112 Wis. 2d 514, 524, 334 N.W.2d 532 (1983) (citing *Wisconsin's Envtl. Decade, Inc. v. Pub. Serv. Comm'n of Wis.,* 69 Wis. 2d 1, 9, 230 N.W.2d 243 (1975)).[21] The *Fox* opinion describes the second step as not only "whether the interest asserted is recognized by law" but also as whether the injury is to a "legally protected interest."[22] Thus, a legally protected interest in *Fox* is an interest recognized by law.

¶ 46. In contrast to the administrative review cases, in Wisconsin cases involving a constitutional challenge to legislative or executive action, to determine the personal interest, the adverse effect, and the judicial policy aspects of standing, the decisions frequently rely on language from federal cases governing standing in constitutional challenges.[23] Thus in *State ex*

---

[21] For substantially similar formulations of the test for determining standing in administrative review cases, see, *e.g., Waste Mgmt. of Wis., Inc v. DNR,* 144 Wis. 2d 499, 503–504, 424 N.W.2d 685 (1988); *Milwaukee Brewers Baseball Club,* 130 Wis. 2d at 65; *Wisconsin's Envtl. Decade,* 69 Wis. 2d at 9–10; *Eller Media, Inc. v. Div. of Hearings & Appeals,* 2001 WI App 269, ¶ 7, 249 Wis. 2d 198, 637 N.W.2d 96; *Town of Delavan v. City of Delavan,* 160 Wis. 2d 403, 411, 466 N.W.2d 227 (Ct. App. 1991); *MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Wis.,* 164 Wis. 2d 489, 494–95, 476 N.W.2d 575 (Ct. App. 1991); *Mendonca v. DNR,* 126 Wis. 2d 207, 209, 376 N.W.2d 73 (Ct. App. 1985).

[22] *Fox,* 112 Wis. 2d at 526.

[23] *See, e.g., State v. Iglesias,* 185 Wis. 2d 117, 132–33, 517 N.W.2d 175 (1994) (citing *Bence v. City of Milwaukee,* 107 Wis. 2d 469, 478, 320 N.W.2d 199 (1982)); *Bence v. City of Milwaukee,* 107 Wis. 2d 469, 478, 320 N.W.2d 199 (1982) (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S.

*rel. First National Bank of Wisconsin Rapids v. M&I Peoples Bank of Coloma,* 95 Wis. 2d 303, 308, 290 N.W.2d 321 (1980), relying on federal cases, the court described the standing question as two-fold: is there an injury and does the constitutional provision on which the claim rests grant the party whose standing is challenged a right to judicial relief. The court explained the standing inquiry as follows:

> Whether the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action" . . . and "whether the constitutional . . . provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief" (citations omitted).[24]

59, 72)); *First Nat'l Bank,* 95 Wis. 2d at 308–09 (citing *Sierra Club v. Morton,* 405 U.S. 727, 731 (1972)); *Polan v. DOR,* 147 Wis. 2d 648, 658, 433 N.W.2d 640 (Ct. App. 1988) (citing *Bence*).

See also *State v. Janssen,* 219 Wis. 2d 362, ¶ 19, 580 N.W.2d 260 (1998) (quoting *Bates v. State Bar of Ariz.,* 433 U.S. 350 (1977): "In the First Amendment arena, however, courts have altered their traditional rules of standing to permit 'attacks on overly broad statutes without requiring that the person making the attack demonstrate that in fact his specific conduct was protected' " (internal citations omitted).).

The requirement of an actual or threatened injury for standing under federal law is derived from the Article III "cases and controversies" limitation on federal court jurisdiction. *First Nat'l Bank,* 95 Wis. 2d at 308–309 (*cited with approval in Chenequa,* 275 Wis. 2d 533, ¶ 14 n.7).

Federal law of standing is not binding on Wisconsin but has been viewed as persuasive in certain cases. *See, e.g., McConkey,* 326 Wis. 2d 1, ¶ 15 n.7; *First Nat'l Bank,* 95 Wis. 2d at 308 n.4; *Wisconsin's Environmental Decade,* 69 Wis. 2d at 11.

[24] Federal standing terminology has been used in cases that do not involve constitutional challenges. *See, e.g., Wisconsin's Environmental Decade,* 69 Wis. 2d at 11; *Metro. Builders Ass'n,* 282 Wis. 2d 458, ¶ 13.

¶ 47. In declaratory judgment actions governed by Wis. Stat. § 806.04, one component of justiciability under the declaratory judgment statute is that the complainant "must have a *legal interest in the controversy—that is to say, a legally protectible interest.*"[25] The courts have declared that this "legal interest/legally protectable interest" requirement in declaratory judgment cases "has often been expressed in terms of standing."[26] Thus the concepts of standing and justiciability (a legally protectable interest) have been viewed as overlapping concepts in declaratory judgment cases.

¶ 48. In *City of Madison v. Town of Fitchburg*, 112 Wis. 2d 224, 228, 332 N.W.2d 782 (1983), a declaratory judgment action, the issue was whether the City of Madison had standing to challenge an incorporation proceeding under Wis. Stat. § 60.81 (1981). Standing did not turn directly on a statute. Section 60.81 was silent regarding standing to challenge incorporation.

---

[25] *Loy v. Bunderson,* 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982) (emphasis added).

The four requisite conditions for declaratory relief are:

(1) There must exist a justiciable controversy—that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it.

(2) The controversy must be between persons whose interests are adverse.

(3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectable interest.

(4) The issue involved in the controversy must be ripe for judicial determination.

*Loy,* 107 Wis. 2d at 409.

[26] *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 228, 332 N.W.2d 782 (1983) (citing numerous cases).

*City of Madison*, 112 Wis. 2d at 228. The court determined the three aspects of standing by evaluating the facts and relevant legal principles. *City of Madison*, 112 Wis. 2d at 230–31. Accordingly, the court decided that the City of Madison had a personal interest in the outcome of the controversy that was adversely affected by the proceeding. *City of Madison*, 112 Wis. 2d at 231.[27] The court then concluded that the City of Madison had standing to advance its claim. *City of Madison*, 112 Wis. 2d at 231–32.

¶ 49. Many declaratory judgment cases do, however, involve interpretation of a statute or declaration of constitutionality.[28] Recently, in *Chenequa Land Conservancy, Inc. v. Village of Hartland,* 2004 WI App 144, ¶¶ 10–16, 275 Wis. 2d 533, 685 N.W.2d 573, a declaratory judgment/standing case, the complainant alleged

[27] In other cases standing similarly did not turn directly on the interpretation of a statute or constitutionality. *See, e.g., Lake Country Racquet & Athletic Club v. Vill. of Hartland,* 2002 WI App 301, 259 Wis. 2d 107, 655 N.W.2d 189 (declaratory judgment; examines facts to determine whether party whose standing is challenged has been adversely affected); *Zehner v. Vill. of Marshall,* 2006 WI App 6, 288 Wis. 2d 660, 709 N.W.2d 64 (declaratory judgment; ¶ 11 cites declaratory judgment test of standing set forth in *Chenequa,* 275 Wis. 2d 533, ¶ 17–30 (examining facts and various statutes to determine personal interest at stake, adverse effect on party whose standing has been challenged, and sound judicial policy to determine whether party should be granted standing, that is, should be granted "a legally protectible interest.")).

[28] *See, e.g., Zehetner,* 272 Wis. 2d 628, ¶ 12 (examining the substantive statutes at issue, Wis. Stat. §§ 421.301, 427.105(1), to determine "whether the party seeking standing was injured in fact, and whether the interest allegedly injured is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question").

that a conveyance violated a statutory requirement. The court of appeals decided the standing of the party by determining whether the party suffered an actual or threatened injury and whether the interest injured "is legally protectible, meaning that the interest is arguably within the zone of interests" that the statute at issue seeks to protect. *Chenequa,* 275 Wis. 2d 533, ¶ 16; *see also id.,* ¶ 15.

¶ 50. *Chenequa* is an example of a recent court of appeals decision pointing out the confusing use of different terminologies in the test for standing and pondering their differences. *Chenequa,* 275 Wis. 2d 533, ¶ 13; *see also Metro. Builders Ass'n of Greater Milwaukee v. Vill. of Germantown,* 2005 WI App 103, ¶ 20, 282 Wis. 2d 458, 698 N.W.2d 301.

¶ 51. In *Chenequa,* the court of appeals acknowledged that in some declaratory judgment cases the court analyzed standing applying a "logical nexus" requirement. Under the logical nexus requirement, the party whose standing is challenged must have suffered an actual or threatened injury and there must be a logical link between that party's status and the claim sought to be adjudicated. The court of appeals queried whether the "logical nexus" requirement in declaratory judgment cases differs from the formulation of standing used in appeals from administrative agency decisions. In the latter cases, the party whose standing is challenged must suffer an "injury in fact and the interest injured must be one protected by law, that is, arguably within the zone of interests to be protected or regulated by the statute or constitutional provision in question."[29]

¶ 52. In *Chenequa,* the court of appeals viewed the "logical nexus" terminology about standing from

[29] *Chenequa,* 275 Wis. 2d 533, ¶ 15.

declaratory judgment cases and the "zone of interest" terminology about standing from administrative law cases as "essentially equivalent." *Chenequa,* 275 Wis. 2d 533, ¶ 16.

¶ 53. After the *Chenequa* decision, the parties in *Metropolitan Builders Association of Greater Milwaukee v. Village of Germantown,* 2005 WI App 103, 282 Wis. 2d 458, 698 N.W.2d 301, debated the significance of *Chenequa* and the different terminologies used in the test for standing. In *Metropolitan Builders,* the court of appeals declared that the differences in the terminology for determining standing in administrative review cases such as *Wisconsin's Environmental Decade* and declaratory judgment cases such as *Chenequa* are "purely semantic." *Metropolitan Builders Ass'n,* 282 Wis. 2d 458, ¶ 20. But the differences in terminology used in the test for standing have never been adequately explained in the cases. We agree with the observation of the court of appeals in *Chenequa:* "Generally, in prior cases we have either concluded there was no injury, and thus there was no need to analyze whether there was a 'legally protectible' interest that was injured or threatened with injury, . . . or, without specifically discussing the meaning of 'legally protectible,' we have analyzed the relevant constitutional provision or statute." *Chenequa,* 275 Wis. 2d 533, ¶ 16 n.8 (citations omitted).

¶ 54. The case law can be better understood (even though there are inconsistencies in terminology) upon a careful analysis of the nature of each case. In all three types of cases discussed above—administrative law review, constitutional challenges, and declaratory judgments—substantive statutory or constitutional provisions are at issue and govern standing. The es-

sence of the question of standing in these cases (that is, the essence of determining personal interest, adverse effect, and judicial policy, the three aspects of standing) is whether there is an injury and whether the injured interest of the party whose standing is challenged falls within the ambit of the statute or constitutional provision involved.

¶ 55. In other words, the question is whether the party's asserted injury is to an interest protected by a statutory or constitutional provision. Contrary to the assertions in Justice Roggensack's concurrence, our delineating the essence of this court's standing analyses does not necessarily eliminate the two-part test established in *Fox*, 112 Wis. 2d at 524, which is applicable to administrative review cases, or the two-fold analysis described in *First National Bank*, 95 Wis. 2d at 308, applicable to actions based in the constitution, or the justiciability analysis established by *Loy v. Bunderson*, 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982). These "tests," while at times inconsistently used by courts, when appropriately used are tools for determining personal interest, adverse effect, and judicial policy, the three essential aspects of standing. In these cases a court decides standing by examining the facts and interpreting a statute, rule, or constitutional provision at issue.[30]

¶ 56. In other cases, such as the present case and several cases cited in the margin at notes 17 and 27, no statute or constitutional provision is viewed as directly governing the standing analysis. No statute or constitutional provision expressly relates to or protects the interest asserted by the party whose standing is chal-

---

[30] *See, e.g., Wisconsin's Envtl. Decade*, 69 Wis. 2d at 14–20 (statute recognizes an interest in environment as basis for standing; facts show members of association live within affected area).

lenged. Therefore that party's personal interest does not necessarily involve a "legally protectable interest," as that phrase is used in the case law to mean "an interest within the zone of interests protected by a statute or constitution." Instead, in such cases, a court determines whether the asserted interest of the party whose standing is challenged is to be recognized by the court on the basis of the facts and relevant legal principles.

¶ 57. Declaring that the party has a legally protectable interest is the legal conclusion a court reaches after examining the interests involved, applicable statutes, constitutional provisions, rules, and relevant common law principles.[31]

D

¶ 58. We now turn to the standing question presented in the instant case, in which no statutory or constitutional provision is directly at issue.

¶ 59. A non-client party's standing to seek disqualification of an opposing party's attorney on the ground that the current representation may breach a duty to a non-party former client is one of first impression in Wisconsin. This issue requires the court to

---

[31] *See, e.g., Krier v. Vilione,* 2009 WI 45, ¶¶ 15–46, 317 Wis. 2d 288, 766 N.W.2d 517 (determining that under the facts and legal principles applicable in that case the plaintiffs did not have standing, stating: "While the law of standing is to be liberally construed, this theory of liability set forth by the plaintiffs is not recognized in Wisconsin jurisprudence, and we will not pave the way for such relief with today's decision because *corporate law principles establish* that the plaintiffs have no standing to seek these damages in this case. Third-party liability precedent does not convey standing to the plaintiffs, and *the damages claimed by the plaintiffs do not correspond with the claims alleged*" (emphasis added).).

*See also* cases cited at n.27, *supra.*

determine whether under the facts and relevant legal principles Bishop's Grove has a personal interest in the controversy; whether Bishop's Grove's interest will be adversely affected; and whether judicial policy calls for protecting Bishop's Grove's interest.

■

¶ 60. In Wisconsin former clients have standing to object to their former attorney's representation of someone else. The former client is protecting the duties the attorney owes to the client.[32]

¶ 61. When a non-client party moves for disqualification of opposing counsel who has represented a non-party former client, the non-client party is urging that the duties owed to a non-party former client be enforced because the prior representation is so connected with the current litigation that the prior representation is likely to affect the just and lawful determination of the non-client party's position. Thus, in the present case, in moving for disqualification of the plaintiffs' attorney, Bishop's Grove is urging that the duties the plaintiffs' counsel owes to the Foster Group and Wayne Foster be enforced because the prior representation is so connected with the current litigation that the prior representation is likely to affect the just and lawful determination of Bishop's Grove's position.

---

[32] In several Wisconsin cases, the court has recognized the standing of a current or past client to complain of an attorney's representation. *See, e.g., Forecki v. Kohlberg,* 237 Wis. 67, 295 N.W. 7 (1940); *Berg v. Marine Trust Co.,* 141 Wis. 2d 878, 416 N.W.2d 643 (Ct. App. 1987); *Mathias v. Mathias,* 188 Wis. 2d 280, 283, 525 N.W.2d 81 (Ct. App. 1994).

In *Berg* and *Mathias,* the parties did not contest that the party moving for disqualification was a former client, and therefore the court did not analyze standing, but instead focused its analysis on the application of the "substantially related" test to a motion for disqualification.

¶ 62. Ordinarily, the "doctrine of standing prohibits a litigant from raising another's legal rights."[33] Jurisdictions have divided, however, on whether a non-client party has standing to assert the duties owed to a non-party former client.

¶ 63. Some jurisdictions adhere to a strict rule that a non-client party does not have standing to move to disqualify an attorney.[34] These jurisdictions conclude that only a client or former client has standing to seek disqualification of its attorney.[35] This strict position seems contrary to the general doctrine in Wisconsin law that standing is generally not construed narrowly or restrictively but rather broadly in favor of those seeking access to the courts.[36]

¶ 64. Furthermore, this strict position does not seem appropriate in Wisconsin, in which direct actions against insurance companies are allowed. Under Wis. Stat. § 632.24, a plaintiff may bring a direct action against an insurance company without naming the in-

[33] *Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032, 1055 (Wash. 1987) (citing *Allen v. Wright*, 468 U.S. 737, 750–51 (1984)).

[34] One district court has characterized this position as the majority position. *Colyer v. Smith*, 50 F. Supp 2d 966, 969 (C.D. Cal. 1999).

[35] *See, e.g., In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir. 1976) ("As a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification").

For an analysis of federal cases discussing whether a non-client has standing to move to disqualify a party's counsel either as a constitutional or prudential issue, see *Colyer v. Smith*, 50 F. Supp. 2d 966 (C.D. Cal. 1999).

[36] *Popenhagen,* 309 Wis. 2d 601, ¶ 24.

sured as a party.[37] Adhering to the strict standing rule in this context would be too restrictive. An insurance company sued under the direct action statute would be prohibited as a non-client party defendant from bringing a motion to disqualify opposing counsel on the basis of counsel's prior representation of the insurance company's insured. Such a rule of standing would be too restrictive. Yet, the insurance company has a personal interest in the litigation that is adversely affected when the insurance company's insured (who is not a named party) is a former client of the complaining party's attorney.

¶ 65. Reasons often cited for prohibiting a non-client party from seeking disqualification of an opposing party's counsel are that an attorney's duties a to client are designed to protect the client, not other persons;[38] that disqualification motions might be used abusively as a litigation tactic and this should be discouraged;[39] and that the rules of professional conduct are to be enforced through disciplinary agencies, not to be used as procedural weapons in civil actions.

---

[37] For instance, in the present case, although the Foster Group is not a named party in the litigation, it is an insured under Bishop's Grove's business liability insurance policy as exclusive property manager of Bishop's Grove.

[38] "[T]he only injury that results from the breach of confidentiality is personal to [the former client]. [The non-client] has no standing to complain that information obtained . . . will be used against him." *Colyer v. Smith,* 50 F. Supp. 2d 966, 973 (C.D. Cal. 1999).

[39] *Yarn Processing,* 530 F.2d at 90 ("To allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist."); *Colyer,* 50 F. Supp. 2d at 973 ("The standing requirement protects against the strategic exploitation of the rules of ethics long disfavored by the Courts.").

¶ 66. At the other end of the spectrum, a minority of jurisdictions concludes that a non-client party has standing to move to disqualify opposing counsel.[40] These courts rely in part on a "court's well recognized power to control the conduct of attorneys practicing before it."[41] This expansive standing rule is also based on an attorney's obligation to report violations of rules of professional conduct.[42]

¶ 67. This broad view of standing might open the door to numerous motions to disqualify and might enable parties to misuse the motion as a procedural weapon to obtain delay and increase the opposing parties' costs. On the other hand, a bright-line rule barring a non-client's standing may encourage a party to strategically refuse to name a former client as a party although in proving the case counsel must necessarily implicate the former client.

¶ 68. A third group of jurisdictions seems to take a middle position.[43] In these courts, the general rule is

[40] *See, e.g., Dawson v. City of Bartlesville*, 901 F. Supp. 314, 315 (N.D. Okla. 1995).

[41] *Colyer*, 50 F. Supp. 2d at 970 (analyzing *Kevlik v. Goldstein,* 724 F.2d 844 (1st Cir. 1984) (non-client party has standing to bring a motion for disqualification of opposing counsel); *Estates Theatres, Inc. v. Columbia Pictures Indus., Inc.,* 345 F. Supp. 93, 97–98 (S.D.N.Y 1972) (non-client has standing to move for disqualification of counsel)).

[42] *See, e.g., Kevlik,* 724 F.2d at 847 ("The Model Code of Professional Responsibility, DR 1–103(A) clearly requires that an attorney come forward if he has knowledge of an actual or potential violation of a Disciplinary Rule . . . .").

[43] Stephen Gillers, *Regulation of Lawyers: Problems of Law and Ethics* 279 (8th ed. 2009) (citing *In re Appeal of Infotechnology,* 582 A.2d 215, 221 (Del. 1990); *Colyer v. Smith,* 50 F. Supp. 2d 966 (C.D. Cal. 1999)).

that a non-client party cannot move to disqualify opposing counsel on the ground that the current representation may be a breach of duties owed to the former client. Narrow exceptions to the general rule, however, are recognized.[44]

¶ 69. We are persuaded that a middle course represents a good balance of conflicting goals and is in keeping with our law broadly recognizing standing "as a matter of sound judicial policy." The middle course avoids the pitfalls of a rule that a non-client party has no standing to move to disqualify opposing counsel and a rule that every non-client party has standing. The middle course recognizes that a rule of professional conduct "does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule;"[45] that rules of professional conduct "can be subverted when they are invoked by opposing parties as procedural weapons;"[46] and that a non-client party does not generally have standing to enforce a violation of the Rules of Professional Conduct for Attorneys.[47]

¶ 70. Yet the middle course also recognizes that under some circumstances a breach of duties owed to a non-party former client may impact the just and lawful determination of a non-client party's position and that

---

[44] For a discussion of some exceptions, see *Yarn Processing,* 530 F.2d at 89.

[45] SCR Ch. 20, Rules of Professional Conduct for Attorneys, Scope ¶ 20 ("[V]iolation of a rule *does not necessarily warrant* any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation").

[46] SCR Ch. 20, Rules of Professional Conduct for Attorneys, Scope ¶ 20.

[47] *In re Appeal of Infotechnology,* 582 A.2d 215, 220–21 (Del. 1990).

under these circumstances it is sound judicial policy for the non-client party to have standing to move for disqualification.

■

¶ 71. Accordingly, we conclude that as a general rule only a former or current client has standing to move to disqualify an attorney from representing someone else in a civil action. Nevertheless, in cases involving a challenge to a party's standing to bring a motion for disqualification of opposing counsel on the ground that opposing counsel is breaching duties to a non-party former client, to determine the personal interest, the adverse effect, and the judicial policy aspects of standing in Wisconsin we conclude that a non-client party has standing to move for disqualification of opposing counsel, when the prior representation is so connected with the current litigation that the prior representation is likely to affect the just and lawful determination of the non-client party's position.[48]

¶ 72. The doctrine of standing in the present case explores whether a connection exists between the current and prior representations and whether the prior representation is likely to affect the just and lawful determination of the non-client party's position. In contrast, the standard of law (examined in Part III, below) for determining whether an attorney should be disqualified explores whether the current and subsequent representations involve a substantially related matter.

---

[48] See Infotechnology, 582 A.2d at 221; FMC Techs., Inc. v. Edwards, 420 F. Supp. 2d 1153, 1156–57 (W.D. Wash. 2006) (when complainant shows that the ethical conflict at issue sufficiently impacts the just and lawful determination of their claims and the conflict is so intertwined with the current litigation, the court will consider the complainant's motion to disqualify opposing counsel).

E

¶ 73. We now turn to the facts of this case. Although Wayne Foster and the Foster Group are not parties to the slip-and-fall litigation, Wayne Foster as well as employees of the Foster Group may be key witnesses for the plaintiffs. The plaintiffs' witness list includes Wayne Foster and authorized representatives of Bishop's Grove Condominium to testify about maintenance of the premises. The plaintiffs apparently intend to rely upon the testimony of Wayne Foster regarding the duties and actions of the Foster Group as the exclusive property manager of the Condominium in establishing Bishop's Grove's liability.

¶ 74. Moreover, in the instant case, Wayne Foster and the employees of the Foster Group may not merely be witnesses. Rather, according to the plaintiffs' theory of the case, Bishop's Grove is liable for the acts and omissions of Wayne Foster and the Foster Group. According to the record, Bishop's Grove's liability in the slip-and-fall action will likely turn on the actions or omissions of the Foster Group or Wayne Foster, as Bishop's Grove's exclusive property manager.

¶ 75. The Foster Group's and Wayne Foster's conduct as manager connects the current litigation with counsel's prior representation of Wayne Foster and the Foster Group. The record demonstrates that opposing counsel's firm represented the Foster Group and Wayne Foster for many years and that the representation related to condominiums. Nothing in the record limits the nature of the attorney's representation involving condominiums. Except for statements denying any representation specifically connected with Foster Group's management of Bishop's Grove, the record does not affirmatively state that the prior representation was

not in any way related to the Foster Group's management of condominium properties.

¶ 76. According to Bishop's Grove's counsel, the plaintiffs have an unfair advantage arising out of their counsel's prior representation of the Foster Group and Wayne Foster. Implicit in the affidavits and argument is Bishop's Grove's claim that opposing counsel has special insight into how the Foster Group operates and manages condominium developments and a special relationship with Wayne Foster that advantages the plaintiffs. In support of its argument about the plaintiffs' counsel's familiarity with Wayne Foster, Bishop's Grove relied on the plaintiffs' attorney's communications with Wayne Foster with respect to the present litigation.

¶ 77. The first communication between the plaintiffs' counsel and Wayne Foster was a phone call to Wayne Foster prior to the commencement of litigation. At the plaintiffs' counsel's request, Wayne Foster agreed to communicate with the claims adjuster and explain condominium law and the concept of common property. In the opinion of the plaintiffs' counsel, the insurance company's claims adjuster did not understand condominium law and the concept of common property.

¶ 78. The second communication between the plaintiffs' counsel and Wayne Foster was a letter that the plaintiffs' attorney sent to Wayne Foster notifying him of the time and place of his deposition, instead of serving a subpoena or communicating with opposing counsel.

¶ 79. Bishop's Grove asserts that these communications show the familiarity between Wayne Foster and the plaintiffs' counsel based on their attorney-client relation and that the familiarity helps the plaintiffs to Bishop's Grove's disadvantage.

¶ 80. On the basis of this record, we conclude that Bishop's Grove fits under the exception to the general rule that a non-client party does not have standing to bring a disqualification motion against opposing counsel. In the present case, Bishop's Grove has standing to move for disqualification of opposing counsel. Bishop's Grove has a personal interest in the motion to disqualify opposing counsel that is adversely affected because the prior representation is connected with the current litigation so that the prior representation appears to have an impact on the just and lawful determination of Bishop's Grove's position.

### III

¶ 81. We now turn to the second question presented on appeal, namely whether the circuit court's standard for determining disqualification of the Cramer firm, the "appearance of impropriety," is the correct legal standard. If not, what is the correct standard?

¶ 82. A circuit court has "broad discretion" in determining whether an attorney should be disqualified.[49] An appellate court will sustain a circuit court's discretionary determination of an attorney's disqualification if the determination is based on the facts of record and on the appropriate and applicable law and is the product of a rational mental process by which the facts and law are considered together to reach a reasoned and reasonable determination.[50]

---

[49] *In the Interest of Steveon R.A.,* 196 Wis. 2d 171, 177, 537 N.W.2d 142 (Ct. App. 1995); *Berg v. Marine Trust Co.,* 141 Wis. 2d 878, 887, 892, 416 N.W.2d 643 (Ct. App. 1987).

[50] *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981).

¶ 83. A circuit court's discretionary determination based on an error of law is an erroneous exercise of discretion.[51] Whether a circuit court applied the appropriate and applicable law is a question of law that an appellate court determines independently of the circuit court but benefiting from its analysis.[52] In determining the applicable law in the present case, we may have to interpret and apply the Supreme Court Rules of Professional Conduct for Attorneys. Interpretation and application of a Supreme Court Rule is a question of law that an appellate court determines independently of the circuit court, benefiting from its analysis.[53] Whether the facts fulfill a legal standard is ordinarily a question of law that an appellate court determines independently of the circuit court, benefiting from its analysis.[54]

A

¶ 84. In the present case, Bishop's Grove, the non-client, asserts the client's (the Foster Group's and Wayne Foster's) grounds for disqualification of plain-

But when, as in this case, the circuit court did not hold an evidentiary hearing on the disqualification motion, and all evidence is in written form, the circuit court has no advantage over an appellate court in the formulation of ethical norms. *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labs., Inc.,* 607 F.2d 186, 189 (7th Cir. 1979).

[51] *State v. Hutnik,* 39 Wis. 2d 754, 763, 159 N.W.2d 733 (1968); *Berg,* 141 Wis. 2d at 887, 892.

[52] *Popenhagen,* 309 Wis. 2d 601, ¶ 23.

[53] *Filppula-McArthur ex rel. Angus v. Halloin,* 2001 WI 8, ¶ 32, 241 Wis. 2d 110, 622 N.W.2d 436.

[54] *Acuity Mut. Ins. Co. v. Olivas,* 2007 WI 12, ¶ 67, 298 Wis. 2d 640, 726 N.W.2d 258.

tiffs' counsel. We therefore apply in the present case the law of disqualification relating to a former client's attempt to disqualify counsel in a subsequent representation of another person.[55]

¶ 85. A fundamental principle in an attorney-client relationship is that the lawyer owes duties to a client and a former client. Most of the core concepts of lawyer conflicts of interest were developed through common-law decisions long before jurisdictions officially adopted lawyer codes.[56] "[T]he confidence and trust underlying the attorney-client relationship are foundational to the practice of law and deeply rooted in our law and Professional Rules."[57]

¶ 86. The resolution of the issue of disqualification in the present case is thus guided by our prior case law and the precepts of the Supreme Court Rules of Professional Conduct for Attorneys regarding an attorney's duties to former clients.[58] Appellate courts

---

[55] *See, e.g., FMC Techs.,* 420 F. Supp. 2d at 1157 (when determining a non-client's motion to disqualify on the ground that a client's right to confidentiality may be breached, the court refers to the rules regulating the conduct of attorneys).

Bishop's Grove may thus advance the Foster Group's and Wayne Foster's rights as former clients of the plaintiffs' counsel. Justice Roggensack's concurrence, on the other hand, would limit Bishop's Grove's standing to assertions that the plaintiffs' attorney has obtained information through a breach of the duty of confidentiality owed to Bishop's Grove. *See* Justice Roggensack's concurrence, ¶¶ 138, 180–183.

[56] Introductory Note to The Restatement (Third) of Law Governing Lawyers (2000).

[57] *Sands v. Menard, Inc.,* 2010 WI 96, ¶ 53, 328 Wis. 2d 647, 787 N.W.2d 384.

[58] Nothing in the Supreme Court Rules of Professional Conduct for Attorneys, or in the Preamble or in the Scope,

have often cited the Rules of Professional Conduct for guidance in non-disciplinary cases, including disqualification cases.[59] The Introductory Note to the Restatement (Third) of Law Governing Lawyers (2000) ex-

states that a violation of a rule of professional responsibility cannot be used in a court's ruling on a motion for disqualification of a lawyer in litigation.

The Scope does present a caution that a violation "does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation" or establish "a basis for civil liability." Preamble, ¶ 14 explains that the Rules of Professional Conduct "are rules of reason" and "should be interpreted with reference to the purposes of legal representation and of the law itself."

[59] *See, e.g., Sands,* 328 Wis. 2d 647, ¶ 53 (reviewing arbitration award; attorney's fiduciary duty of loyalty based on Rules of Professional Conduct); *Tensfeldt v. Haberman,* 2009 WI 77, ¶ 62 n.25, 319 Wis. 2d 329, 768 N.W.2d 641 ("The Supreme Court Rules of professional conduct for attorneys provide guidance regarding the scope of representation."); *State v. Meeks,* 2003 WI 104, ¶¶ 59–60, 263 Wis. 2d 794, 666 N.W.2d 859 ("Policy considerations play a fundamental role in protecting the very important relationship between attorney and client. The attorney-client privilege provides sanctuary to protect a relationship based upon trust and confidence. . . . We hold that Scholle's opinions, perceptions, and impressions of Meeks' competency to proceed are within the attorney-client privilege set forth in Wis. Stat. § 905.03 and SCR 20:1.6."); *D&D Carpentry, Inc. v. U.S. Bancorp,* 2010 WI App 122, ¶ 8, 329 Wis. 2d 435, 792 N.W.2d 193 ("[S]o far as settlements are concerned, the general rule is that an attorney has no authority to enter into a binding settlement agreement without his or her client's consent. . . . SCR.20.1.2(a) (2007–08)"); *Rand v. Rand,* 2010 WI App 98, ¶ 6, 327 Wis. 2d 778, 787 N.W.2d 445 ("When a circuit court awards attorney fees, the amount of the award is left to the discretion of the court. . . . Among the factors to be considered are those set out in Supreme Court Rule 20:1.5(a), which we quote below.")

plains that lawyer code provisions may be relevant for the purpose of a motion for disqualifying a lawyer.

 ██

¶ 87. The Wisconsin cases explain that the standard to apply in disqualifying an attorney on the ground of the attorney's former representation of a client is the "substantially related" standard. "[T]he attorney will be disqualified if the subject matter of the two representations [is] 'substantially related.' "[60]

 ██

¶ 88. Our case law further explains that matters are substantially related "if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second."[61] A court need not find that an attorney has actually breached ethical standards or revealed client confidentiality.[62] It is only necessary that an attorney have undertaken representation that is adverse to the interests of a former client.[63] A serious possibility that the interest represented by the attorney in the subsequent

*See also Steveon R.A.,* 196 Wis. 2d at 178–80 (determining attorney disqualification on basis of SCR 20:1.7); *Burkes v. Hales,* 165 Wis. 2d 585, 588–89, 478 N.W.2d 37 (Ct. App. 1991) (determining attorney disqualification on basis of Code of Professional Responsibility); *Berg,* 141 Wis. 2d at 890–91 (disqualification case; "the need to maintain that trust forms the basis for one of the ethical canons underlying the substantial relationship test: that lawyers should avoid 'even the appearance of professional impropriety.' SCR 20.48 [1986].").

[60] *Berg,* 141 Wis. 2d at 885. *See also Burkes,* 165 Wis. 2d at 588–89 (citing *Berg*).

[61] *Berg,* 141 Wis. 2d at 886.

[62] *Id.* at 892; *City of Whitewater v. Baker*, 99 Wis. 2d 449, 453, 299 N.W.2d 584 (Ct. App. 1980).

[63] *Berg,* 141 Wis. 2d at 892.

employment is adverse to the interest represented in the original employment may be enough for disqualification.[64]

¶ 89. The circuit court did not apply the substantially related standard in the present case. Instead, it applied an "appearance of impropriety" test. The circuit court thus erred as a matter of law. The "appearance of impropriety" test that the circuit court applied is not the appropriate standard for disqualification of an attorney based on duties to a former client. "The possible appearance of impropriety . . . is simply too weak and too slender a reed on which to rest a disqualification order . . . ."[65]

---

[64] *State v. Miller,* 160 Wis. 2d 646, 659, 467 N.W.2d 118 (1991).

[65] *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 723 (7th Cir. 1982). *See* Charles W. Wolfram, *Symposium: Restatement of the Law Governing Lawyers: Former-Client Conflicts,* 10 Geo. J. Leg. Ethics 677, 686–87, n.35 (1997) (the "appearances" concept is antiquated although occasionally shows spasmodic signs of life).

Before the court of appeals adopted the substantially related standard in 1987 in the *Berg* case, two other cases raised the issue of disqualification of an attorney because of prior representation. In one of the cases, *City of Whitewater v. Baker,* 99 Wis. 2d 449, 299 N.W.2d 584 (Ct. App. 1980), the court of appeals made two references to avoiding the "appearance of impropriety" in deciding the disqualification of an attorney. *Id.* at 453, 456.

The *Berg* court, 141 Wis. 2d at 883–85, analyzed these two prior cases as follows:

> There are few Wisconsin cases on the subject of disqualification of an attorney on grounds that he or she has undertaken representation of a client whose interests are adverse to those of a former client, and none has adopted a methodology for determining when disqualification is appropriate. In *Ennis v. Ennis,* 88 Wis. 2d 82,

¶ 90. The seminal case setting forth the substantially related standard, and the case upon which Wis-

276 N.W.2d 341 (Ct. App. 1979), we held that an attorney who represented the wife in a postjudgment divorce proceeding, where another member of his law firm had represented the husband in the original action, was guilty of "a serious breach of the Code of Professional Responsibility" and should be disqualified. *Id.* at 98, 276 N.W.2d at 347. Noting that the attorney's conflict of interest was "obvious," *id.* at 99, 276 N.W.2d at 348, we did not discuss the matter further.

In *City of Whitewater v. Baker*, 99 Wis. 2d 449, 299 N.W.2d 584 (Ct. App. 1980), an attorney represented Baker in connection with his purchase of real estate, drafting the deed, and providing related services. A few years later, Baker became involved in a dispute with the city over the widening of an adjoining street. He brought an action to declare his interest in the property and was promptly sued by the city to force removal of several alleged encroachments on the street right-of-way. Baker's former lawyer represented the city in both actions, and we held that the trial court erred when it declined to disqualify him. We noted that a court need not find that the attorney has actually engaged in unethical conduct or disclosed the former client's confidences in order to be disqualified on grounds of conflict of interest. All that is required is that "the attorney has undertaken representation of a client whose interests are adverse to those of the former client." *Id.* at 453, 299 N.W.2d at 586. This is so, we said, because "[a]ttorneys are obligated to avoid even the appearance of impropriety." *Id.*; *Ennis,* 88 Wis. 2d at 98–99, 276 N.W.2d at 348.

In *Whitewater,* 99 Wis. 2d at 455, 299 N.W.2d at 587, as in *Ennis,* the conflict was "obvious," and we were not called upon to analyze the facts under any particular test for disqualification. The *Whitewater* opinion does, however, acknowledge the existence of two tests for disqualification based on inconsistent or adverse representations. One test was said to be whether the new employment will require the attorney to do anything "that will injuriously affect a former client in any matter in which he formerly represented him and also whether the attorney will be called on . . . to use against a former client any knowledge or information acquired in the former relationship." *Id.* at 454, 299 N.W.2d at 587, citing 7 Am.Jur.2d Attorneys at Law, sec. 156, p. 140 (1963) [now sec. 186, pp. 238–39] (footnote omitted). The *Whitewater* court also referred to a "federal" test for inconsistent employment—"whether a 'sub-

447

consin case law is based,[66] is *T.C. Theatre Corp. v. Warner Brothers Pictures,* 113 F. Supp. 265, 268 (S.D.N.Y. 1953). "[W]here any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited."[67] In establishing this standard, the federal district court in *Theatre Corp.* relied upon the American Bar Association's Model Canons of Professional Ethics, although the case was not a disciplinary case.[68]

¶ 91. Thus, likewise, in determining whether the Cramer firm should be disqualified under the substantially related standard, we refer to the Wisconsin Rules

stantial relation' exists between the subject matter of the former representation and the issues in the later adverse representation," *id.* at 454-55 n.1, 299 N.W.2d at 587—and suggests that the attorney would have been subject to disqualification under either standard because his subsequent representation was "obviously adverse" to his representation of the former client. *Id.* at 455, 299 N.W.2d at 587.

In this case the parties argued, and the trial court applied, the "substantial relationship" test. The test has been applied in every federal circuit for more than thirty years, and in most state courts as well. Because we believe it to be the appropriate test to be utilized in attorney disqualification cases, we adopt and apply it here.

(Footnotes omitted.)

[66] *Burkes,* 165 Wis. 2d at 591, n.4.

[67] *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F. Supp. 265, 268 (S.D.N.Y. 1953).

[68] "A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer. He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason of the confidential relationship. Related to this principle is the rule that where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited." *T.C. Theatre,* 113 F. Supp. at 268.

448

of Professional Conduct for Attorneys governing the conduct of members of the bar. The Rules provide principles for an attorney's duties to former and current clients. We again emphasize that the instant case does not involve a determination of unethical conduct. This is a disqualification proceeding, not a disciplinary proceeding. The circuit court concluded that the plaintiffs' law firm did not engage in any unethical conduct of any kind.

¶ 92. In examining the Rules of Professional Conduct, we look at SCR 20:1.9 because Bishop's Grove's motion to disqualify the Cramer firm is based on the firm's duty owed to former clients.[69]

¶ 93. In pertinent part, SCR 20:1.9(a) provides as follows:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in a writing signed by the client.
>
> . . . .
>
> (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

---

[69] Supreme Court Rule 20:1.7, entitled "Conflicts of interest current clients," is generally relevant in the present case, too. Although Rule 20:1.7 focuses on current client conflicts, it implicates former client conflicts as well. Rule 20:1.7 provides, *inter alia,* that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a *former* client . . ." (emphasis added).

449

(1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

¶ 94. In applying SCR 20:1.9 to determine whether disqualification is required, a court must determine: (1) whether there was an attorney-client relationship and whether it has ceased; (2) whether the subsequent representation of another person involves the same or a substantially related matter; (3) whether the interests of the subsequent client are materially adverse to those of the former client; and (4) whether the former client consented to the new representation.[70]

### B

¶ 95. In the instant appeal, it is undisputed that an attorney-client relationship had existed between the Cramer firm and Wayne Foster and the Foster Group and that the Cramer firm no longer represented Wayne Foster or the Foster Group at the time the slip-and-fall litigation began.[71] Furthermore, no one asserts that the former clients (Wayne Foster and the Foster Group) have consented to the Cramer firm's representation of the plaintiffs in the present case.

[70] American Bar Association, *Annotated Model Rules of Professional Conduct*, Rule 1.9 Duties to Former Clients (6th ed. 2007).

[71] If the attorney-client relationship were ongoing, disqualification would be guided by SCR 20:1.7.

¶ 96. The disagreement in the present case lies mainly with the interpretation of "substantially related." Wisconsin courts have been using the substantially related standard in attorney disqualification cases when an attorney represents a party in a matter in which the adverse party is that attorney's former client.[72] We now apply the substantially related standard in the present case in which the attorney's former client is not a party.

¶ 97. The substantially related standard is not only explained in our case law but is further explained in the American Bar Association Model Rules of Professional Conduct and comments thereto, which are not binding on Wisconsin courts but are instructive when interpreting Wisconsin Supreme Court Rules that are analogous to the ABA Model Rules.[73] The Comments to ABA Model Rule 1.9[74] describe the "substantially related" standard as follows:

---

[72] *Burkes,* 165 Wis. 2d at 591 n.4 (the substantially related standard is employed in virtually all jurisdictions); *Berg,* 141 Wis. 2d at 885.

[73] *See In re Disciplinary Proceedings Against Marks,* 2003 WI 114, ¶ 65, 265 Wis. 2d 1, 665 N.W.2d 836; *State v. Maloney,* 2005 WI 74, ¶ 20, 281 Wis. 2d 595, 698 N.W.2d 583.

[74] The text of SCR 20:1.9 is substantially identical to § 1.9 of the American Bar Association's Model Rules of Professional Responsibility. The Wisconsin comment to the Rule states: "The Wisconsin Supreme Court Rule differs from the Model Rule in requiring informed consent to be confirmed in a writing 'signed by the client.' "

The comments to ABA Model Rule 1.9 are published in the Supreme Court rules and while not adopted "may be consulted for guidance in interpreting and applying the Rules of Professional Conduct for Attorneys." Wisconsin Comment to SCR ch. 20 Preamble: A Lawyer's Responsibilities.

Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.

¶ 98. The Restatement (Third) of The Law Governing Lawyers similarly describes the substantially related standard.[75] The Comments to § 132 of the Restatement explain that "[a] subsequent matter is substantially related to an earlier matter . . . if there is a substantial risk that the subsequent representation will involve the use of confidential information of the former client obtained in the course of the representation . . . . Substantial risk exists where it is reasonable to conclude that it would materially advance the client's position in the subsequent matter to use confidential information obtained in the prior representation."[76]

¶ 99. The substantially related standard "has sometimes proved much easier to recite than to describe accurately or to apply confidently."[77] To assist

[75] Section 132 governing a representation adverse to the interests of a former client is similar to SCR 20:1.9 and provides as follows:

The current matter is substantially related to the earlier matter if:

(1) the current matter involves the work the lawyer performed for the former client; or

(2) there is a substantial risk that representation of the present client will involve the use of information acquired in the course of representing the former client, unless that information has become generally known.

[76] Restatement (Third) of The Law Governing Lawyers § 132 cmt. d(iii) (2002).

[77] Wolfram, *supra* note 65, at 680.

courts in applying the standard, it is helpful to understand the rationale of the substantially related standard. The standard reflects several concerns, including protecting the confidential information of the former client obtained in the course of representation; protecting the present client by disqualifying counsel who might be constrained in effective representation because of an obligation to a former client;[78] and protecting the lawyer such that retention of the lawyer for services on specific cases or issues will not be transformed into the lawyer's lifetime commitment.[79]

¶ 100. A central concern underlying the substantially related standard in SCR 20:1.9, and disqualification based on a breach of duties owed a former client, is confidentiality between the attorney and the former client. Maintaining confidentiality of information relating to representation is a fundamental principle in the attorney-client relationship.[80] This fundamental principle encourages clients "to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter." SCR 20:1.6, ABA Comment 2. By protecting attorney-client confidentiality, a court maintains public confidence in the legal profession and protects the integrity of the judicial process.[81]

---

[78] See SCR Rule 1.7 (a)(2), set forth in the margin at note 80, *supra*.

[79] Restatement (Third) of The Law Governing Lawyers, § 132 cmt. b (2002).

[80] *Meeks*, 263 Wis. 2d 794, ¶ 33.

[81] *Freeman v. Chicago Musical Instr. Co.*, 689 F.2d 715, 721 (7th Cir. 1982).

¶ 101. If attorney-client confidentiality were the only interest to consider in disqualification of counsel, there would be no need for the substantially related standard, as confidentiality would be best protected by a blanket rule precluding lawyers from representations adverse to any former client. But, a blanket disqualification rule would unnecessarily deny persons their chosen counsel.

██

¶ 102. In Wisconsin, a litigant's right to prosecute or defend a suit with an "attorney of the suitor's choice" is protected by the state Constitution. Article I, Section 21(2) of the Wisconsin Constitution states: "In any court of this state, any suitor may prosecute or defend his suit *either in his own proper person or by an attorney of the suitor's choice*" (emphasis added).[82]

---

[82] Five states, Alabama, Georgia, Michigan, Mississippi, and Utah, have comparable constitutional guarantees to counsel in civil proceedings. Only Wisconsin provides that such counsel may be freely selected by the individual represented.

*Alabama Constitution Art. I, § 10 (2010)*

Sec. 10. Right to prosecute civil cause. That no person shall be barred from prosecuting or defending before any tribunal in this state, *by himself or counsel,* any civil cause to which he is a party (emphasis added).

*Georgia Constitution Art. I, § 1, ¶ XII (2010)*

PARAGRAPH XII. Right to the courts

No person shall be deprived of the right to prosecute or defend, *either in person or by an attorney,* that person's own cause in any of the courts of this state (emphasis added).

*Michigan Constitution Art. I, § 13 (2010)*

§ 13. Conduct of suits in person or by counsel. A suitor in any court of this state has the right to prosecute or defend his suit, *either in his own proper person or by an attorney* (emphasis added).

¶ 103. The state constitutional right of representation in any court "by an attorney of the suitor's choice" is not, however, absolute.

¶ 104. For example, in *Lorscheter v. Lorscheter,* 52 Wis. 2d 804, 808, 191 N.W. 200 (1971), the court concluded that a party in a default divorce proceeding was not entitled to substitute a new attorney on the day of the hearing when she had not complied with the statutory framework governing attorney substitution in pending actions. The right to counsel of one's choice may be denied when it unduly interferes with the administration of justice. *Id.*

¶ 105. Similarly, a suitor's choice of counsel is limited by the court's licensure and bar membership requirements.[83] The constitutional right to an attorney of the suitor's choice is tempered by the requirement that counsel be licensed in Wisconsin.

¶ 106. The Wisconsin Constitution grants each person a right of representation in any court "by an attorney of the suitor's choice." This constitutional right is safeguarded when the court protects clients by

---

*Mississippi Constitution Art. 3, § 25 (2010)*

§ 25. Access to courts. No person shall be debarred from prosecuting or defending any civil cause for or against him or herself, before any tribunal in the state, *by him or herself, or counsel, or both* (emphasis added).

*Utah Constitution Art. I, § 11 (2010)*

§ 11. [Courts open — Redress of injuries.] All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, *by himself or counsel,* any civil cause to which he is a party (emphasis added).

[83] *See* SCR 10.03(4).

maintaining high ethical standards of attorney professional responsibility.

¶ 107. Cognizant of the interests to be balanced in deciding disqualification motions, we turn to the factors to be considered in determining whether an attorney's current representation is substantially related to the attorney's prior representation.

¶ 108. The assessment of whether the former and current representations are "substantially related" is case-specific and involves a process of factual reconstruction. It requires a court to determine first the likelihood that the lawyer was exposed to confidential information based on the matter of the prior representation. Then the court must assess the likelihood that confidential information will be relevant in the current representation.[84]

¶ 109. Incidental similarities between the prior and current representations do not support disqualification.[85] Relying upon incidental similarities creates a standard that is overly broad and improperly infringes on the rights of persons to obtain counsel of their choosing. "[T]he fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client."[86]

---

[84] Wolfram, *supra* note 65, at 717.

[85] "[R]epresentation in cases of mere *positional* conflict . . . should almost never be barred in the serial context." 1 Hazard & Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct,* § 1.9:202 (2d ed. 1996).

[86] SCR 20:1.9, ABA Comment 8. *See Vestron Inc. v. Nat'l Geographic Soc'y,* 750 F. Supp. 586, 595 (S.D.N.Y. 1990) ("[I]f

¶ 110. Finally, we examine the remaining criterion under SCR 20:1.9, that is, whether the current representation is materially adverse to the former client. Whether an attorney's current representation is materially adverse to a former client is likewise a fact-intensive analysis. [87]

¶ 111. The analysis should focus on whether the current representation may cause the former client financial, legal, or some other identifiable harm.[88] The court must determine "the degree to which the current representation may actually be harmful to the former client."[89]

## C

¶ 112. The circuit court in the present case did not examine whether the attorney's current representation was "substantially related" to the prior representation or was "materially adverse" to the former client. Instead, the circuit court relied on an erroneous standard, whether an "appearance of impropriety" resulted from the plaintiffs' attorney's communication with Wayne Foster in the present litigation.

¶ 113. We conclude that the circuit court applied an incorrect standard of law in disqualifying the plain-

---

insight into a former client's general 'litigation thinking' were to constitute 'relevant privileged information,' then disqualification would be mandated in virtually every instance of successive representation. That clearly is not the law . . . ."). *See also* Annot. Model Rules of Prof. Conduct, Rule 1.9. (2007).

[87] *See* Restatement (Third) of Law Governing Lawyers, § 132 cmt. e. (2002) (discussing "materially adverse").

[88] *See Simpson Performance Prods., Inc. v. Robert W. Horn, P.C.,* 92 P.3d 283, 288 (Wyo. 2004) (citing *ABA/BNA Lawyers' Manual on Professional Conduct,* § 51:220 (2002)).

[89] *Simpson Performance Prods.,* 92 P.3d at 288.

tiffs' attorney, namely disqualifying the attorney on the basis of the "appearance of impropriety." Given the paucity of facts in the record relating to the attorney's prior representation of the Foster Group and Wayne Foster, we are unable to determine whether the two representations are substantially related such that the confidences of the Foster Group and Wayne Foster are implicated in this personal injury action or whether the current representation is materially adverse to the former client.

¶ 114. We cannot determine from the record before us whether the circuit court's order disqualifying the plaintiffs' attorney is erroneous when applying the correct standard. Accordingly, we reverse the order of the circuit court disqualifying the plaintiffs' attorney and remand the matter to the circuit court for such further proceedings as the circuit court determines are appropriate to resolve the question presented.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded.

¶ 115. DAVID T. PROSSER, J. *(concurring)*. The certification from the court of appeals asked this court to resolve a specific question of standing:

> Does a non-client party (Bishop's Grove) have standing to move for the disqualification of the opposing party's attorney based on that attorney's prior representation of a non-party (the Foster Group and Wayne Foster)?

¶ 116. The lead opinion concludes that Bishop's Grove has standing in this case, and in this I concur.

¶ 117. In reaching this result, however, the lead opinion engages in a lengthy review of Wisconsin cases and produces, in effect, a restatement of the law. It is this restatement of Wisconsin law on standing that triggers two concurrences and some angst.

458

¶ 118. To the extent that the lead opinion attempts to bring order out of chaos in our law on standing, it serves a constructive purpose. We all benefit when the court provides a clear restatement of the law. However, if the restatement changes the law while purporting simply to clarify it, it goes beyond the facts, effects a result that was neither requested nor briefed by the parties, and creates confusion among the bench and bar.

¶ 119. My concern may be summarized as follows. "Any particular standing regime can fall on a spectrum from restrictive, where potentially no one can challenge certain wrongs, to permissive, where almost anyone can sue." Eugene Kontorovich, *What Standing is Good For,* 93 Va. L. Rev. 1663, 1668 (Nov. 2007). A good faith effort to help the bar identify where Wisconsin law is on this "spectrum" is helpful. Conversely, an effort to move Wisconsin's position on the "spectrum" from one place to another is not helpful unless there is a full appreciation of what is being done—and has majority support.

¶ 120. When the lead opinion relies on new and different terms and employs a different analysis, it permits an inference that the law is being changed. In my view, the majority of the court does not favor changing the law.

¶ 121. The statement in the lead opinion that "[s]tanding in Wisconsin is not to be construed narrowly or restrictively, but rather should be construed liberally," lead op., ¶ 38, has ample rhetorical support in our cases. Nevertheless, Wisconsin case law does not support the proposition that standing is such a low hurdle that "almost anyone can sue."

¶ 122. The lead opinion reads:

Upon careful analysis of the case law, it is clear that the essence of the determination of standing is: (1) whether

459

the party whose standing is challenged has a personal interest in the controversy (sometimes referred to . . . as a "personal stake" in the controversy); (2) whether the interest of the party whose standing is challenged will be injured, that is, adversely affected; and (3) whether judicial policy calls for protecting the interest of the party whose standing has been challenged.

Lead op., ¶ 5; *see* also lead op., ¶ 40.

¶ 123. For the most part, the lead opinion substitutes the phrase "personal interest" for "personal stake." *See id.* So long as these phrases mean the same thing, there should be no complaint. If, however, the phrase "personal interest" means something less than "personal stake," I do not subscribe to it.

¶ 124. "A person has standing to seek judicial review when that person has a *personal stake* in the outcome and is directly affected by the issues in controversy." *Schill v. Wis. Rapids Sch. Dist.* 2010 WI 86, ¶ 38, 327 Wis. 2d 572, 786 N.W.2d 177 (emphasis added). A person has a personal stake in the outcome when a person has suffered an actual injury to a legally protected interest, *McConkey v. Van Hollen,* 2010 WI 57, ¶ 15, 326 Wis. 2d 1, 783 N.W.2d 855 (citing *State ex rel. First Nat'l Bank v. M&I Peoples Bank,* 95 Wis. 2d 303, 308, 290 N.W.2d 321 (1980)), or is threatened with such an injury, *Krier v. Vilione,* 2009 WI 45, ¶ 20, 317 Wis. 2d 288, 766 N.W.2d 517 (citing *Chenequa Land Conservancy, Inc. v. Vill. of Hartland,* 2004 WI App 144, ¶¶ 13–16, 275 Wis. 2d 533, 685 N.W.2d 573).

¶ 125. The second prong listed by the lead opinion is "injury," that is, "the interest [personal stake] of the party . . . is adversely affected." I take "adversely affected" to mean actual injury.

¶ 126. The third prong of the lead opinion is "judicial policy." What this means is not entirely clear, but it

460

may be illuminated by considering the differences between standing under federal law and standing under Wisconsin law.

¶ 127. The United States Supreme Court has described the law of standing under the federal Constitution as "a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). Under Article III of the Constitution, the judicial power of the federal courts is limited to the resolution of "cases" and "controversies." *Id.* Accordingly, standing *must* exist in order to invoke the jurisdiction of the court. *Horne v. Flores*, __ U.S. __, 129 S. Ct. 2579, 2592 (2009).

¶ 128. The Court has explained that the requirement of "actual injury redressable by the court serves several of the implicit policies embodied in Article III." *Valley Forge*, 454 U.S. at 472 (citations and quotations omitted). These policies include ensuring that legal questions are decided in a "concrete factual context conducive to a realistic appreciation of the consequences" of the court's decision. *Id.* This concrete factual context also allows the court to make a decision without worrying that its decision will have unforeseen consequences in cases presenting different facts. *Id.*

¶ 129. Another policy underlying federal standing doctrine is a respect for the autonomy of the individuals who may be most directly affected by a judicial decision, by refusing to allow courts to be used as "a vehicle for the vindication of the value interests of concerned bystanders." *United States v. SCRAP*, 412 U.S. 669, 687 (1973). By requiring litigants to have a personal stake in the outcome, federal standing doctrine assures that the arguments presented will sharpen the presentation

461

of issues and thus be of greater assistance to the court in making its decision. *Flast v. Cohen,* 392 U.S. 83, 99 (1968).

¶ 130. As the lead opinion has noted, in Wisconsin the law of standing does not have a jurisdictional component, but is rather a matter of "judicial policy," lead op., ¶ 40 n.18. The discussion of "judicial policy" in our precedent has tended to emphasize the difference between our doctrine and the federal, jurisdictional doctrine, instead of providing clear analysis of what "judicial policy" is. In my view, judicial policy embodies the same prudential considerations discussed by the Supreme Court in *Valley Forge.*

¶ 131. Judicial policy is not, and has not been, carte blanche for the courts of Wisconsin to weigh in on issues whenever the respective members of the bench find it desirable. Nor, it should be noted, is it an escape hatch that allows courts to avoid issues that would be troubling or politically inconvenient to decide. While the question of standing does require a case by case analysis, "judicial policy" should not allow us to create an ad hoc standard for every new case.

¶ 132. This court has recently attempted to articulate some of the prudential considerations that underlie our standing doctrine, in *Krier* and *McConkey.*

¶ 133. In *Krier,* the court declined to extend standing to plaintiffs whose arguments had no basis in Wisconsin or traditional corporate law. *Krier,* 317 Wis. 2d 288, ¶ 20. The court specifically pointed out that if it were to find standing in this context, "there would be no stopping point to liability." *Id.,* ¶ 23. We did not find it appropriate to open a "universe of entities or people" who could potentially bring suit by recognizing standing. *Id.,* ¶ 20.

¶ 134. In *McConkey,* on the other hand, the court recognized standing because—among other reasons—if the case were dismissed on standing grounds, another plaintiff would bring an identical suit. *McConkey,* 326 Wis. 2d 1, ¶¶ 17–18. Even though the court stated it was "troubled by the broad general voter standing articulated by the circuit court," it found that judicial efficiency would best be served by allowing the case to proceed. *Id.,* ¶ 17. The court also considered many of the prudential considerations enumerated by the United States Supreme Court, including whether another plaintiff might argue the case more zealously or present more fully the issues involved. *Id.,* ¶ 18.

¶ 135. In sum, it should be clear that the third prong listed by the lead opinion is not a "catch-all" provision that would allow courts to act as they see fit. If it is analyzed as a separate element, it is merely a continuation of the prudential considerations this court has upheld in the past.

¶ 136. With these caveats, I respectfully concur.

¶ 137. PATIENCE DRAKE ROGGENSACK, J. *(concurring).* The lead opinion concludes that the defendants have standing to object to the plaintiffs' choice of attorney in this slip and fall negligence action. The lead opinion so concludes based on a potential witness's past employment of the plaintiffs' attorney's law firm for land and condominium development that is unrelated to the Bishop's Grove Condominiums.[1] The interest that the lead opinion identifies is the attorney-client confidences of the potential witness that are protected by Supreme Court Rule (SCR) 20:1.9.[2]

---

[1] Lead op., ¶¶ 5–8.

[2] *Id.,* ¶ 94.

■■■■■■■■■■■■■■■■■■■■■■■■

¶ 138. I do not join the lead opinion for three reasons: (1) it creates and then applies a new test for standing that does not require Bishop's Grove to make a showing that it has a legally protectable interest in the Cramer law firm's attorney-client relationship with a potential witness; (2) it employs ch. 20 of the Supreme Court Rules as a legal basis upon which to confer standing to Bishop's Grove to disqualify plaintiffs' attorney; and (3) whether defendants have standing to challenge plaintiffs' choice of attorney based on a communication of Bishop's Grove's confidential information cannot be decided conclusively on the record before us. Accordingly, I would remand to the circuit court to hold an evidentiary hearing in order to permit Bishop's Grove to demonstrate whether Wayne Foster improperly transmitted Bishop's Grove's confidential information to plaintiffs' attorney.

## I. BACKGROUND

¶ 139. The background underlying this appeal is ably set out in the lead opinion. Therefore, I relate only what is necessary to understand this concurrence.

¶ 140. On February 1, 2007, Susan Foley-Ciccantelli and her husband, Mark Ciccantelli, purchased Unit 175C in the Bishop's Grove Condominiums, Inc. (Bishop's Grove). On February 6, 2007, Susan slipped and fell on ice in the driveway of Unit 175C, a common area of Bishop's Grove. She sustained serious injuries that have required multiple surgeries.

¶ 141. Susan and Mark retained Attorney Timothy Andringa of the law firm of Cramer, Multhauf & Hammes, LLP (Cramer law firm) to represent them in regard to Susan's slip and fall. As part of his representation, Attorney Andringa contacted State Farm Fire &

Casualty Company's (State Farm)[3] adjuster about his clients' claim. When the adjuster responded that Bishop's Grove was not responsible for ice on the driveway of Susan's condominium, Attorney Andringa contacted Wayne Foster. The Foster Group, Ltd., Wayne Foster's agency, manages Bishop's Grove. Attorney Andringa asked Foster to explain to the adjuster where the common areas of Bishop's Grove are and that Bishop's Grove is responsible for maintaining common areas.

¶ 142. Attorney Andringa was familiar with Foster because Attorney Peter Plaushines of the Cramer law firm had represented Foster and The Foster Group in land and condominium development unrelated to Bishop's Grove. The law firm of Reinhart Boerner Van Deuren S.C. (Reinhart law firm) represented Wayne Foster and The Foster Group in regard to the development and management of Bishop's Grove.

¶ 143. No settlement was reached with State Farm. Therefore, on May 7, 2008, Attorney Andringa filed suit against Bishop's Grove and State Farm. He alleged that Susan's injuries were caused by Bishop's Grove's negligent maintenance of the common area where Susan fell.

¶ 144. On January 26, 2009, Bishop's Grove moved to disqualify Attorney Andringa from representing Susan and Mark. The motion alleged that Foster was the exclusive agent for managing Bishop's Grove and that Foster had a "long standing attorney/client relationship with the Cramer law firm." The motion further alleged that "The Cramer firm could have obtained facts, information or knowledge to use against Foster in this case regarding knowledge of condominium documents, their interpretation and continuing duties under property

---

[3] State Farm is Bishop's Grove's insurer.

management." And finally, the motion alleged, "To establish liability against Bishop's Grove it is likely Cramer will need to prove that their former client did something wrong as it pertained to duties and obligations under the condominium documents vis-à–vis the plaintiff or failed in their duties of property management thus placing Cramer in an adverse position as to a former client."

¶ 145. Foster submitted an affidavit in which he averred Attorney Plaushines has represented Foster and The Foster Group "for a variety of business matters." Foster mentions Attorney Plaushines' representation of The Foster Group in "Ruff's Preserve," "Water's Edge" and "Island View." Foster does not aver any connection between Attorney Plaushines and Bishop's Grove, nor does he aver that Attorney Andringa received confidential information about Bishop's Grove in regard to the management agreement of Bishop's Grove, this pending lawsuit or any other matter.

¶ 146. Attorney Andringa submitted an affidavit explaining that his firm had run a conflict of interest check on Bishop's Grove before agreeing to represent Susan and Mark in this slip and fall action. He found that the Cramer law firm had never represented Bishop's Grove, nor has it had any involvement in the creation or development of Bishop's Grove.

¶ 147. Attorney Andringa attached a certified copy of the Articles of Incorporation of Bishop's Grove to his affidavit. That document shows that the Reinhart law firm prepared the condominium document.

## II. DISCUSSION

¶ 148. The lead opinion concludes that Bishop's Grove has standing to object to Attorney Andringa's representation of Susan and Mark because of confi-

dences of Foster developed through past representations of him and The Foster Group by the Cramer law firm.[4] It cites SCR 20:1.9 as the context in which Bishop's Grove's motion to disqualify Attorney Andringa is to be decided.[5]

¶ 149. The lead opinion errs in its discussion of Bishop's Grove's standing when it creates and then applies a new standing analysis[6] and arrives at conclusions that are unsupported by facts in the affidavits of record.[7]

---

[4] *Id.*, ¶ 8.

[5] *Id.*, ¶ 11.

[6] The lead opinion concludes that "a non-client party has standing to move for disqualification of opposing counsel, when the prior representation is so connected with the current litigation that the prior representation is likely to affect the just and lawful determination of the non-client party's position." *Id.*, ¶ 71.

After discarding Wisconsin's long-term standing analysis without acknowledging that it is changing the test for standing, the lead opinion then accords Bishop's Grove's standing. The lead opinion does so on the ground that the attorney's representation may be a breach of the former client's right to confidentiality inasmuch as the defendant has shown that the attorney's "prior representation is so connected with the current litigation that the prior representation is likely to affect the just and lawful determination of the non-client party's position." *Id.*, ¶ 7. As I explain below, this analysis omits the requirement that the petitioner prove a legally protected interest that is personal to the petitioner, which is one part of the two-part test for standing. *Fox v. DHSS,* 112 Wis. 2d 514, 529, 334 N.W.2d 532 (1983).

[7] The lead opinion relates, "The Foster Group's and Wayne Foster's conduct as manager connects the current litigation with counsel's prior representation of Wayne Foster and the Foster Group." Lead op., ¶ 75. However, there is no statement of undisputed fact in any affidavit that supports the conclusion that the Cramer law firm's past representation of Foster and The Foster Group is connected with the current litigation. To

## A. Standard of Review

¶ 150. We determine whether a petitioner has standing to proceed as a question of law that is subject to our independent review. *Metro. Builders Ass'n of Greater Milwaukee v. Vill. of Germantown*, 2005 WI App 103, ¶ 12, 282 Wis. 2d 458, 698 N.W.2d 301.

## B. Standing Principles

¶ 151. Questions of standing are not new to Wisconsin courts. Well reasoned opinions have recently and repeatedly explained that a standing analysis has two parts. *Krier v. Vilione*, 2009 WI 45, ¶ 20, 317 Wis. 2d 288, 766 N.W.2d 517; *Fox v. DHSS*, 112 Wis. 2d 514, 524–25, 334 N.W.2d 532 (1983); *Wis.'s Envtl. Decade, Inc. v. Public Serv. Comm'n of Wis.*, 69 Wis. 2d 1, 9–10, 230 N.W.2d 243 (1975).[8]

---

the contrary, all affiants who commented on whether there was a connection between past representation of Foster or The Foster Group and Bishop's Grove did not aver that the Cramer law firm's representation of Foster and The Foster Group had anything to do with Bishop's Grove.

[8] The same two-part test for standing employed herein has been repeatedly recognized by Wisconsin courts. *See Metro. Builders Ass'n of Greater Milwaukee v. Vill. of Germantown*, 2005 WI App 103, ¶ 13, 282 Wis. 2d 458, 698 N.W.2d 301 (noting that the Wisconsin standing analysis has two parts, "first, whether the challenged action caused direct injury to the petitioner's interest and second, whether the interest affected was one recognized by law"); *Eller Media, Inc. v. Div. of Hearings & Appeals*, 2001 WI App 269, ¶ 7, 249 Wis. 2d 198, 637 N.W.2d 96 (recognizing and applying the above two-part test for standing); *MCI Telecomms. Corp. v. Public Serv. Comm'n of Wis.*, 164 Wis. 2d 489, 494–95, 476 N.W.2d 575 (Ct. App. 1991) (applying the two-part standing test and concluding that MCI did not prove a legally protectable interest); *Town of*

¶ 152. In *Fox,* an often cited case, we explained that standing to proceed requires the petitioner to prove that: (1) he has some "threatened or actual injury resulting from the putatively illegal action"; and (2) the injury or threatened injury is to his legally protectable interest, i.e., an interest of the petitioner that is recognized by law. *Fox,* 112 Wis. 2d at 524–25 (quoted citation omitted).

¶ 153. In *Fox,* District Attorney E. Michael Mc-Cann and other petitioners objected to the proposed location of a prison, contending the proposed location was too remote, thereby having the potential to cause adverse psychological effects on the inmates who would be far removed from their families. *Id.* at 526–27. In order to support their efforts to stop the building of the prison at the proposed location, the petitioners asserted that the Final Environmental Impact Statement (FEIS) failed to comply with the statutory requirements of Wisconsin's Environmental Policy Act (WEPA). *Id.* at 517. In the course of the litigation, petitioners' standing to challenge the FEIS was raised. *Id.* at 523.

¶ 154. We discussed the two parts of a standing analysis that are required in order to have standing to proceed under Wisconsin law. We explained that the actual or threatened injury resulting from the complained of action need not be large. *Id.* at 524. However, an "[a]bstract injury is not enough. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury." *Id.* at 525 (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02 (1983)

*Delavan v. City of Delavan,* 160 Wis. 2d 403, 410–11, 466 N.W.2d 227 (Ct. App. 1991) (recognizing Wisconsin's two-part test for standing); *Mendonca v. DNR,* 126 Wis. 2d 207, 209, 376 N.W.2d 73 (Ct. App. 1985) (employing the same two-part test for standing set out in this concurrence).

(internal quotation marks omitted)). After a thorough discussion, we concluded that the petitioners lacked standing based on the first part of the standing test, i.e., petitioners had not set out a direct injury or the threat of such an injury that is personal to them and was caused by the proposed location of the prison. *Id.* at 529.

¶ 155. We also concluded that the petitioners had failed to show that any claimed injury is to a "legally protected interest" of the petitioners. *Id.* at 529. The petitioners had raised the WEPA as the legal protection for the interest they asserted. However, we concluded that WEPA provided no legal protection for their asserted interest, in part because "WEPA does not create a public trust in the environment such that any citizen of this State may bring suit to question compliance with its provisions." *Id.* at 531.

¶ 156. We again examined the two parts of the standing test in *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 332 N.W.2d 782 (1983). There, the City of Madison and Russell Mueller, a former resident of Fitchburg, objected to Fitchburg's incorporation resolution. *Id.* at 227. The City of Madison explained that the incorporation of Fitchburg would extinguish Madison's extraterritorial zoning and plat approval jurisdiction in Fitchburg, which interests were created by and conferred on Madison by statute. *Id.* at 231. We concluded that these factual allegations were sufficient to allege that Madison had a threatened direct injury to an interest that was legally protected because the interest was granted in the extraterritorial zoning and plat approval statutes. *Id.* at 231–32.[9] Accordingly, we concluded that Madison had standing to proceed.

---

[9] We concluded that Mueller lost his potential for standing when he moved out of Fitchburg; therefore, we did not analyze

¶ 157. The lead opinion sets out a test for "all the cases . . . regardless of the nature of the case" as follows: "(1) whether the party whose standing is challenged has a personal interest in the controversy . . .; (2) whether the interest of the party whose standing is challenged will be injured, that is adversely affected; and (3) whether judicial policy calls for protecting the interest of the party whose standing is challenged."[10]

¶ 158. While I agree with the lead opinion that the test for standing has not always been stated with absolute clarity, I part company with the lead opinion's elimination of the requirement that the petitioner must show it has a "legally protectable interest" that is being harmed. Removal of the "legally protectable interest" determination from the traditional Wisconsin standing test and replacing it with "whether judicial policy calls for protecting the interest of the party whose standing is challenged" changes a discernable legal standard to no standard at all. Thereafter, the determination of standing will be driven by whether a court thinks that "judicial policy" warrants standing, whatever that means.

¶ 159. Furthermore, removing the requirement to show a legally protectable interest in declaratory judgment actions will be a very significant change in Wisconsin's standing rules and cause unnecessary confusion. Long ago in *Loy v. Bunderson,* 107 Wis. 2d 400, 320 N.W.2d 175 (1982), we explained a four-part test for declaratory judgment that is currently employed. The test provides that in order to proceed to declaratory judgment, the following must be present:

the standing question as to him. *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 232, 332 N.W.2d 782 (1983).

[10] Lead op., ¶ 40.

(1) A controversy in which a claim of right is asserted against one who has an interest in contesting it.

(2) The controversy must be between persons whose interests are adverse.

(3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectible interest.

(4) The issue involved in the controversy must be ripe for judicial determination.

*Chenequa Land Conservancy, Inc. v. Vill. of Hartland,* 2004 WI App 144, ¶ 11, 275 Wis. 2d 533, 685 N.W.2d 573 (citing *Loy,* 107 Wis. 2d at 410). There is no benefit to making such a change in long standing law.

¶ 160. The lead opinion also asserts that there has been no requirement to show a legally protectable interest outside of a claim based on constitutional provision, statute, administrative rule or declaratory judgment.[11] Those are formidable categories of cases that the lead opinion will change. Furthermore, we have required a showing of a legally protectable interest when the claim was based on Wisconsin common law.

¶ 161. For example, in our recent discussion of standing in *Krier,* we addressed whether plaintiffs' contention that corporate identities should be disregarded to permit plaintiffs' common law claim. *Krier,* 317 Wis. 2d 288, ¶ 34. As we began our analysis, we emphasized that in order to have standing, "the plaintiffs must show that they suffered or were threatened with an injury to an interest that is legally protectable." *Id.,* ¶ 20 (citing *Chenequa,* 275 Wis. 2d 533, ¶¶ 13–16). We concluded that the plaintiffs had no legally protect-

---

[11] *E.g., id.,* ¶¶ 32, 45.

able interest in a corporation's assets when they were not shareholders of that corporation; and therefore, they had no standing to proceed on their claim. *Id.*, ¶ 34 (citing *Rose v. Schantz,* 56 Wis. 2d 222, 229, 201 N.W.2d 593 (1972)).[12]

## C. Bishop's Grove Claim of Standing

¶ 162. Here, Bishop's Grove's attorney averred in his affidavit that Bishop's Grove has standing to object to Attorney Andringa's representation of Susan and Mark because a member of Attorney Andringa's firm, Attorney Plaushines, represented non-parties, Wayne Foster and The Foster Group. Consequently, Bishop's Grove's attorney claims that Attorney Andringa would know that Foster has general knowledge[13] of how to interpret condominium documents and property management agreements; that Foster is the agent of Bishop's Grove and probably will be a witness at trial; and that plaintiffs may be required to prove Foster's management of Bishop's Grove was deficient in order to prevail on their claim.

---

[12] *Mut. Serv. Cas. Ins. Co. v. Koenigs,* 110 Wis. 2d 522, 527, 329 N.W.2d 157 (1983) (construing standing to appeal based on an alleged interest that was legally protected under contract); *Sandroni v. Waukesha Cnty. Bd. of Supervisors,* 173 Wis. 2d 183, 189, 496 N.W.2d 164 (Ct. App. 1992) (concluding that a subcontractor has no legally protectable interest in actually performing the work for the prime contractor if the prime contractor is awarded the contract; therefore, the subcontractor has no injury and no standing to challenge the award of the contract).

[13] Bishop's Grove's allegations in its motion do not specify that this knowledge is specific to some unique feature of Bishop's Grove's condominium documents or management agreement. Therefore, I assume herein that it is a general level of knowledge.

¶ 163. Based on those allegations and applying well established Wisconsin law to Bishop's Grove's standing claim, it becomes apparent that Bishop's Grove does not clearly identify the two components necessary for standing: (1) a threatened or actual direct injury to Bishop's Grove and (2) a legally protectable interest of Bishop's Grove that is subject to the claimed injury.

¶ 164. When a petitioner does not clearly articulate those two components, it is difficult to evaluate accurately whether the petitioner may suffer a direct injury, without first evaluating whether the interest that the petitioner asserts is legally protectable for the petitioner. *See Fox*, 112 Wis. 2d at 531. In evaluating whether the interest asserted is a legally protectable interest of the petitioner who is asserting it, we examine whether the asserted interest is recognized by law. *Krier*, 317 Wis. 2d 288, ¶ 20. In determining whether the asserted interest is recognized by law as a legally protectable interest of the petitioner, it is helpful to consider the purpose for which the asserted interest was established and the intended beneficiaries of the law that established the claimed interest. *Fox*, 112 Wis. 2d at 531.

¶ 165. In *Krier*, we recently cautioned that while standing is to be liberally construed, the claim asserted must be legally recognizable in Wisconsin jurisprudence. *Krier*, 317 Wis. 2d 288, ¶ 22. We also discussed the requirement that a petitioner seeking standing must prove that it has a legally protectable interest before standing may be conferred in *Waste Management of Wisconsin, Inc. v. DNR*, 144 Wis. 2d 499, 424 N.W.2d 685 (1988). There, Waste Management sought to prevent the development of a landfill, claiming that the landfill would affect Waste Management's economic interests. *Id.* at 505. While we acknowledged that Waste Management's economic interests may be affected, we

concluded that Wis. Stat. § 144.44(2)(nm) (1983–84), on which statute Waste Management relied to show its interest was legally protected, did not protect economic interests. *Id.* at 508–09. After a thorough discussion of all Waste Management's arguments, we concluded that Waste Management did not have standing to challenge the landfill because the interest to which it claimed injury was not a legally protected interest. *Id.* at 513.

¶ 166. In its brief, Bishop's Grove asserts that SCR 20:1.9 establishes legal protection for Bishop's Grove's interest in attorney-client confidences of former clients. However, Bishop's Grove has not alleged it is or was a client of the Cramer law firm. Instead, it raises Foster and The Foster Group's past attorney-client relationship with the Cramer law firm, without any allegation that the Cramer law firm has ever represented Foster or The Foster Group in regard to Bishop's Grove.

¶ 167. Bishop's Grove alleges that because Foster will be a witness in the trial of this case and the plaintiffs may attempt to show Foster's management contributed to Susan's slip and fall, Bishop's Grove has a legally protectable interest in assuring that the Cramer law firm does not use its knowledge of Foster's general familiarity with condominium creation and management to Bishop's Grove's disadvantage.

¶ 168. While Bishop's Grove may have an interest in assuring that Foster has not transmitted confidential information about Bishop's Grove to Attorney Andringa if it can allege facts showing such information, Bishop's Grove has no legally protectable interest that arises under SCR ch. 20. Also, it cannot be based on the attorney-client relationship alleged in the record before us because the attorney-client relationship asserted

was not Bishop's Grove's attorney-client relationship. *Mathias v. Mathias,* 188 Wis. 2d 280, 283, 525 N.W.2d 81 (Ct. App. 1994).[14]

¶ 169. To explain further, Bishop's Grove raises SCR 20:1.9 directives that relate to protecting confidences of former clients. In relevant part, SCR 20:1.9 provides:

> (c) A lawyer . . . whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client, or when the information has become generally known; or
>
> (2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

¶ 170. In order to prevail on a motion to disqualify an attorney based on the transmission of confidential information during legal representation in another matter, the petitioner must prove both parts of a two-part test: "(1) that an attorney-client relationship existed between the attorney and the former client; and (2) that there is a substantial relationship between the two representations." *Mathias,* 188 Wis. 2d at 283.

¶ 171. In *Mathias,* a husband attempted to disqualify the firm that was representing his wife in their divorce because that firm had acted as the husband's

---

[14] There was no evidentiary hearing on the issue of standing. The record relevant to Bishop's Grove's motion to disqualify Attorney Andringa consists of the affidavits of Wayne Foster, Attorney Andringa, Attorney Plaushines, and Attorney Schellinger (defendants' counsel).

attorney for estate planning. *Id.* at 282. There was no dispute that an attorney-client relationship had existed between the husband and the wife's law firm. Therefore, there was little discussion about this part of the test, except to note that such proof was required in order for a petitioner to disqualify an attorney from a pending proceeding based on past legal representation. *Id.* at 283.

¶ 172. It is undisputed that Bishop's Grove has never been a client of the Cramer law firm. Therefore, Bishop's Grove has no attorney-client relationship with the Cramer law firm upon which to base its alleged interest under SCR 20:1.9 by which Bishop's Grove attempts to disqualify Attorney Andringa. *Id.*

¶ 173. Moreover, SCR 20:1.9 is directed at protecting the confidences of former clients and seeks to prevent conflicts of interest wherein a lawyer may use the confidences of a former client to the detriment of that client in service of another client. SCR ch. 20 Preamble: A Lawyer's Responsibilities [8]. The Preamble demonstrates that the purpose of the rules is not to provide remedies outside the realm of professional discipline. *Id.*, Scope [20].

¶ 174. As the Preamble states, the rules set out in ch. 20 "define proper conduct for purposes of professional discipline." *Id.*, Scope [14]. "Failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process." *Id.*, Scope [19]. However, even the "violation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation." *Id.*, Scope [20]. Furthermore, "[t]he fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, *does not imply that an antagonist*

477

*in a collateral proceeding or transaction has standing to seek enforcement of the rule." Id.* (emphasis added).

¶ 175. Here, Bishop's Grove asserts that it has standing to enforce its interpretation of SCR 20:1.9 against Attorney Andringa. Bishop's Grove's attempted enforcement of SCR 20:1.9 is contrary to the purpose of SCR ch. 20. SCR ch. 20 is intended to protect clients and former clients and to assist lawyers in proper conduct. It does not provide a legally protectable interest for those who are not and have never been clients. *Id.*

¶ 176. The lead opinion eliminates one part of Wisconsin's test for standing by not requiring Bishop's Grove to prove that it has a legally protectable interest in confidential communications of Foster and The Foster Group that do involve Bishop's Grove, thereby forming a basis for disqualifying Attorney Andringa, and instead, construes SCR ch. 20 to provide the legal basis for such an interest.[15] The Preamble to SCR ch. 20 specifically states it does *not* provide the legal basis for standing to assert the interest Bishop's Grove alleges.

¶ 177. As we explained in *Waste Management,* in order to have legal protection for the interest asserted, the petitioner must show that it falls within the class of persons the statute or regulation was enacted to protect and that its claimed injury is of a type proscribed by that statute or regulation. *Waste Mgmt.,* 144 Wis. 2d at 508–09. Bishop's Grove has made no showing that it has, or has ever had, an attorney-client relationship with the Cramer law firm. Therefore, Bishop's Grove is not within the class of persons that SCR 20:1.9 was meant to protect and the injury it claims is not of the type of injury described in SCR 20:1.9.

---

[15] Lead op., ¶¶ 5, 11.

¶ 178. Few cases have directly addressed standing to utilize rules or legal principles governing lawyers' relationships with their clients. However, we squarely addressed this question in *Forecki v. Kohlberg*, 237 Wis. 67, 295 N.W. 7 (1940), *reh'g denied*, 237 Wis. 67, 296 N.W. 619 (1941). In *Forecki*, Forecki and Zaleski commenced an action to recover damages for personal injuries they sustained in a collision between the Kohlberg and Zaleski automobiles. *Id.* at 69. Both plaintiffs were of the opinion that Kohlberg was the sole cause of the collision. *Id.* at 73–74. Therefore, Forecki did not sue Zaleski, who was the driver of the car in which Forecki was a passenger. *Id.* at 70, 73–74. We saw no problem with Forecki's decision not to sue Zaleski.[16] *Id.* at 75.

¶ 179. The defendants asserted error occurred when the trial court permitted two lawyers who were affiliated with one another to represent all plaintiffs, alleging that the plaintiffs were potentially adverse and that by permitting the representation that occurred, the defendants were disadvantaged. *Id.* at 73. It was argued that the defendants did not have standing to raise the contention that Forecki and Zaleski had adverse interests and were represented by lawyers who were affiliated, a proposition with which we agreed. "[W]e think it clear that defendants have no right to object on the ground that Attorneys Hess and Wickham represented adverse interests. . . . 'Only a party who sustains a relation of client to an attorney who undertakes to represent conflicting interests may be entitled to object to such representation.' " *Id.* at 75 (citation omitted).

---

[16] Bishop's Grove similarly implies that it is disadvantaged because Susan and Mark did not sue Foster or The Foster Group as the managers of Bishop's Grove. However, Bishop's Grove cites no statute or other law requiring plaintiffs to sue Foster or The Foster Group, and this writer has found none.

¶ 180. The Preamble to SCR ch. 20 is consistent with the conclusion in *Forecki* that it is the client or former client who has a legally protectable interest in the principles attendant to the attorney-client relationship, not a third party who attempts to gain an advantage from the attorney-client relationship of another. SCR ch. 20 Preamble, Scope [20]. Accordingly, I conclude that Bishop's Grove has no legally protectable interest in the Cramer law firm's representation of Foster or The Foster Group grounded in the Supreme Court Rules or the common law that protects the confidential nature of attorney-client communications, even if one were to assume that Susan and Mark's claims cause them to question the reasonableness of The Foster Group's management of Bishop's Grove.

¶ 181. Furthermore, Bishop's Grove has no legally protectable interest in Foster's general knowledge of condominium documents or condominium management. Foster's interpretation of condominium documents that do not relate to Bishop's Grove has nothing to do with conferring standing on Bishop's Grove, and Foster's interpretation of Bishop's Grove's condominium documents and management agreement will become readily apparent to any attorney who represents Susan and Mark during the civil discovery process that is applicable to this case. Therefore, because Bishop's Grove has identified no legally protectable interest of Bishop's Grove, Bishop's Grove does not have standing to object to Attorney Andringa's representation of Susan and Mark in this action based on the attorney-client relationship between Attorney Plaushines of the Cramer law firm and Foster or The Foster Group.

¶ 182. However, it does not necessarily follow from this conclusion that Bishop's Grove has no legally protectable interest in preserving the confidential na-

ture of its own proprietary information, if such is at issue here. I have interpreted Bishop's Grove's disqualification motion's allegation, "The Cramer firm could have obtained facts, information or knowledge to use against Foster in this case regarding knowledge of condominium documents, their interpretation and continuing duties under property management," as an allegation that the Cramer law firm knows that Foster has a general understanding of condominiums and their management because they have represented Foster and The Foster Group in the development of other condominiums. However, if Bishop's Grove actually is asserting that the Cramer law firm has some knowledge of proprietary and confidential information of Bishop's Grove, the specifics of any such allegation do not appear in the affidavits that form the record for this appeal and would require an evidentiary hearing.

## III. CONCLUSION

¶ 183. I do not join the lead opinion for three reasons: (1) it creates and then applies a new test for standing that does not require Bishop's Grove to make a showing that it has a legally protectable interest in the Cramer law firm's attorney-client relationship with a potential witness; (2) it employs ch. 20 of the Supreme Court Rules as a legal basis upon which to confer standing to Bishop's Grove to disqualify plaintiffs' attorney; and (3) whether defendants have standing to challenge plaintiffs' choice of attorney based on a communication of Bishop's Grove's confidential information cannot be decided conclusively on the record before us. Accordingly, I would remand to the circuit court to hold an evidentiary hearing in order to permit Bishop's Grove

to demonstrate whether Wayne Foster improperly transmitted Bishop's Grove's confidential information to plaintiffs' attorney.

¶ 184. I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLEMAN join this concurrence.